MOHAMMED SABRA, as next friend
of Baby M,

        Plaintiff,

v.

MICHAEL POMPEO, in his
official capacity as Secretary
of the United States
Department of State

        Defendant.

No. 19-cv-2090 (EGS)

REDACTED

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Mohammed B. Sabra ("Mr. Sabra"), a naturalized U.S. citizen and a California resident, brings this action as next friend of "Baby M"[1] against Defendant Michael Pompeo, in his official capacity as the Secretary of the United States Department of State (the "Secretary"). Mr. Sabra claims that his wife, Ponn M. Sabra ("Mrs. Sabra"), gave birth to their daughter, Baby M, in Gaza. Mr. Sabra contends that Baby M became a U.S. citizen at birth because both of her parents are U.S. citizens. Under 8 U.S.C. § 1401(c), a child born abroad acquires U.S. citizenship if both parents are U.S. citizens and one of

---

[1] The Court shall refer to M.M.S., the minor in this case, as Baby M. *See* Fed. R. Civ. P. 5.2(a)(3); *see also* LCvR 5.4(f)(2).

them has had a residence in the United States before the child's birth. Congress granted the Secretary the authority to determine the citizenship of a person outside of the United States pursuant to 8 U.S.C. § 1104.

In June 2019, Mrs. Sabra applied in person at the U.S. Embassy in Jerusalem (the "Embassy") for a Consular Report of Birth Abroad ("CRBA") and U.S. passport as proof of Baby M's U.S. citizenship, citing a need for urgent medical treatment in the United States. Mrs. Sabra did not provide any travel plans for Baby M's urgent medical care, and Baby M did not attend the in-person interview because she was hospitalized. Because Mrs. Sabra failed to provide written medical records to substantiate Baby M's medical condition, the Embassy did not excuse Baby M's personal appearance. Given Mrs. Sabra's "advanced age," the Embassy requested documentary evidence establishing that Mrs. Sabra was Baby M's mother. Due to the indicia of fraud and inconsistencies in the submissions, the Embassy extended the deadline for the submission of additional evidence to establish Baby M's claim to U.S. citizenship. Litigation ensued. After Baby M's health became stable, Mr. and Mrs. Sabra declined the Embassy's offer to apply in person with Baby M for the CRBA and U.S. passport. In October 2019, the Embassy denied Mrs. Sabra's applications.

Seeking declaratory, mandamus, and injunctive relief (Counts I-III), Mr. Sabra claims that the supporting documentation establishes Baby M's entitlement to U.S. citizenship. With respect to his request for a declaratory judgment (Count I), Mr. Sabra contends that the Embassy's failure to issue the CRBA and U.S. passport constitutes a violation of Baby M's fundamental rights to citizenship and travel under the Due Process Clause of the Fifth Amendment to the United States Constitution. Mr. Sabra asserts an alternative claim under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, claiming that the Embassy's request for DNA testing and photographs showing Mrs. Sabra pregnant with Baby M interferes with Mr. and Mrs. Sabra's sincerely held religious beliefs (Count IV). Construing Mr. Sabra's challenge to the Embassy's actions as one under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Secretary argues that Mr. Sabra must seek relief pursuant to the statutory scheme in 8 U.S.C. § 1503.

Pending before the Court are the parties' cross-motions for summary judgment. Upon careful consideration of the parties' submissions, the applicable law, and the entire record herein, the Court concludes that: (1) Mr. Sabra has failed to provide satisfactory proof of birth, identity, and citizenship for the issuance of Baby M's CRBA and U.S. passport; and (2) the

Secretary has failed to demonstrate that the Embassy's request for DNA testing and photographs showing Mrs. Sabra pregnant furthers a compelling governmental interest by the least restrictive means under RFRA. Therefore, the Court **DENIES** Mr. Sabra's Motion for Summary Judgment as to Counts I-III, **GRANTS** the Secretary's Motion for Summary Judgment as to Counts I-III, and **DENIES** the Secretary's Motion for Summary Judgment as to Count IV.

## II.   Background

The Court assumes the parties' familiarity with the factual and procedural background in this case. The Court begins with the statutory and regulatory framework and then summarizes the relevant background. Unless otherwise indicated, the material facts—drawn from the parties' submissions—are not in dispute. *See, e.g.*, Def.'s Statement of Material Facts ("Def.'s SOMF"), ECF No. 18-2 at 1-6; Pl.'s Counter-Statement of Material Facts ("Pl.'s SOMF"), ECF No. 21-2 at 1-11; Pl.'s Reply to Def.'s Counterstatement to Pl.'s SOMF, ECF No. 23-1 at 1-8.[2]

### A. Statutory and Regulatory Framework

The Immigration and Nationality Act of 1952 ("INA") sets forth the general rules for acquiring U.S. citizenship. *Sessions*

---

[2] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

*v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017) (citing INA,
Pub. L. No. 82-414, § 301(a)(3), 66 Stat. 163, 235-36, codified
as amended, 8 U.S.C. § 1401). Section 1401(c), the subsection
relevant here, provides that a person "shall" be a national and
citizen of the United States at birth if the person is "born
outside of the United States and its outlying possessions of
parents both of whom are citizens of the United States and one
of whom has had a residence in the United States or one of its
outlying possessions, prior to the birth of such person."
8 U.S.C. § 1401(c); *see also* 8 U.S.C. § 1101(a)(33) (defining
"residence" as "the place of general abode; the place of general
abode of a person means his principal, actual dwelling place in
fact, without regard to intent").

### 1. Determinations of U.S. Citizenship

The Secretary is "charged with the administration and the
enforcement of . . . immigration and nationality laws relating
to . . . the determination of nationality of a person not in the
United States." 8 U.S.C. § 1104; *see also* 22 C.F.R. § 50.1(d)
(defining "national" as "a citizen of the United States or a
noncitizen owing permanent allegiance to the United States").
Two official documents provide proof of U.S. citizenship: (1) a
passport issued by the Secretary; and (2) a CRBA issued by the
State Department's consular officer. 22 U.S.C. § 2705. And "the
Secretary may issue . . . CRBAs . . . to U.S. citizens born

abroad '[u]pon application and the submission of satisfactory proof of birth, identity and nationality.'" *Chacoty v. Pompeo*, 392 F. Supp. 3d 1, 3 (2019) (quoting 22 C.F.R. § 50.7(a)).

The Secretary has the authority "to cancel any [U.S.] passport . . . if it appears that such document was illegally, fraudulently, or erroneously obtained from, or was created through illegality or fraud practiced upon, the Secretary." 22 U.S.C. § 211a. "The issuance or cancelation of a CRBA . . . 'affect[s] only the document and not the citizenship status of the person.'" *Chacoty*, 392 F. Supp. 3d at 3 (quoting 8 U.S.C. § 1504(a)). "That is because CRBAs, like passports, do not confer citizenship; rather, they merely provide proof of one's status as a citizen." *Id.*

The State Department "shall" determine claims of U.S. citizenship "when made by persons abroad on the basis of an application for registration, for a passport, or for a [CRBA]." 22 C.F.R. § 50.2. Determinations of U.S. citizenship may be made abroad by a consular officer or a designated nationality examiner. *Id.* "A [CRBA] may only be issued by a consular officer, who will review a designated nationality examiner's provisional approval of an application for such report and issue the report if satisfied that the claim to nationality has been established." *Id.* An applicant for a CRBA "shall be required to submit proof of the child's birth, identity and citizenship

meeting the evidence requirements" for passports. 22 C.F.R.
§ 50.5 (referencing 22 C.F.R. ch. I, subch. F, pt. 51, subpt.
C).

## 2. The Documentary Evidence

Under the applicable regulations, the applicant bears the
burden of proof that he or she is a U.S. citizen, 22 C.F.R.
§ 51.40, and "[t]he applicant must provide documentary evidence
that he or she is a U.S. citizen or non-citizen national," *id.*
§ 51.41. For a person born in the United States applying for a
passport for the first time, a birth certificate serves as
primary evidence, and "[t]he birth certificate must show the
full name of the applicant, the applicant's place and date of
birth, the full name of the parent(s), and must be signed by the
official custodian of birth records, bear the seal of the
issuing office, and show a filing date within one year of the
date of birth." *Id.* § 51.42(a). "Secondary evidence includes but
is not limited to hospital birth certificates, baptismal
certificates, medical and school records, certificates of
circumcision, other documentary evidence created shortly after
birth but generally not more than 5 years after birth, and/or
affidavits of persons having personal knowledge of the facts of
the birth." *Id.* § 51.42(b).

For first-time passport applicants born outside the United
States, the person "must submit documentary evidence," which

includes a CRBA, certificate of naturalization, and certificate of citizenship. *Id.* § 51.43(a)-(b). "An applicant without one of these documents must produce supporting documents as required by the [State] Department, showing acquisition of U.S. citizenship under the relevant provisions of law." *Id.* § 51.43(b)(2).

For CRBA applicants, "[p]roof of [the] child's birth usually consists of, but is not limited to," the following documents: (1) "an authentic copy of the record of the birth filed with local authorities"; (2) "a baptismal certificate"; (3) "a military hospital certificate of birth"; or (4) "an affidavit of the doctor or the person attending the birth." 22 C.F.R. § 50.5(a). Where there is no proof of the child's birth, "the person seeking to register the birth shall submit his affidavit explaining why such proof is not available and setting forth the facts relating to the birth." *Id.* As for the proof of the child's citizenship, "[e]vidence of parent's citizenship and, if pertinent, evidence of parent's physical presence in the United States as required for transmittal of claim of citizenship by the [INA] shall be submitted." *Id.* § 50.5(b).

The State Department has the discretion to require additional evidence in support of an application. *E.g.,* 22 C.F.R. § 51.45 ("The Department may require an applicant to provide any evidence that it deems necessary to establish that he or she is a U.S. citizen or non-citizen national, including

evidence in addition to the evidence specified in 22 CFR 51.42 through 51.44."); 22 C.F.R. § 51.23(c) ("The Department may require such additional evidence of identity as it deems necessary.").

### 3. Personal Appearance for First-Time Applicants

Before the issuance of a first-time passport, "the application shall be duly verified by his oath before a person authorized and empowered by the Secretary of State to administer oaths." 22 U.S.C. § 213; *see also* 22 U.S.C. § 212 ("No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States."). Generally, a minor under the age of sixteen should appear with his or her parents or legal guardians when applying for a CRBA and passport. *See* 22 C.F.R. § 51.28(a)(1) ("Minors under 16 years of age applying for a passport must appear in person, unless the personal appearance of the minor is specifically excused by a senior passport authorizing officer, pursuant to guidance issued by the Department."); *see also* 7 Foreign Affairs Manual ("FAM") § 1444.1(c) (explaining that "[w]hen the infant or child is seriously ill and the subject of a medical evacuation, a personal appearance may not be possible" and the family may pursue the CRBA after the medical evacuation).

Finally, the consular officer has the discretion to require the personal appearance of the minor, especially "when the consular officer suspects that the child is deceased or that the child's true identity is not being reported." 7 FAM § 1444.1(b). If the personal appearance is excused, the Secretary's designated official administers the oath to the parents or legal guardians executing the application on behalf of the minor. 22 C.F.R. § 51.28(a)(1).

### B. Factual and Procedural Background

Mr. Sabra, a naturalized U.S. citizen, was born in Jerusalem, and he is domiciled in California. Pl.'s SOMF, ECF No. 21-2 at 8; *see also* Def.'s Ex. 2, ECF No. 18-3 at 30. His wife, Mrs. Sabra, is a U.S. citizen who was born in Connecticut. Def.'s Ex. 2, ECF No. 18-3 at 29. Mr. and Mrs. Sabra have been married since 1995,[3] *see* Def.'s Ex. 2, ECF No. 18-3 at 28, and they had three daughters before Baby M's birth, *see* P. Sabra Decl., ECF No. 52-2 at 2 ¶ 6; *see also* Pl.'s SOMF, ECF No. 21-2 at 3.

---

[3] The year in Mr. Sabra's Statement of Material Facts is inconsistent with the year on the official marriage license. *Compare* Pl.'s SOMF, ECF No. 21-2 at 9 (stating that Mr. and Mrs. Sabra have been married since 1998), *with* Def.'s Ex. 2, ECF No. 18-3 at 28 (showing that the State of Connecticut issued the marriage license on October 3, 1995). Mrs. Sabra avers that she has been married to Mr. Sabra since 1995. Decl. of Ponn Sabra ("P. Sabra Decl."), ECF No. 52-2 at 2 ¶ 5.

## 1. The Pregnancy and Baby M's Birth

In September 2018, Mrs. Sabra moved from the United States to Gaza with her three daughters because her two eldest daughters attend college there. P. Sabra Decl., ECF No. 52-2 at 2 ¶ 8. After arriving in Gaza, Mrs. Sabra discovered that she was pregnant with Baby M. *Id*. at 2 ¶ 9. Mrs. Sabra decided to stay in Gaza to be close to Mr. Sabra's family there. *Id*. at 3 ¶ 12. At all relevant times, Mrs. Sabra's age satisfied the World Health Organization's definition for women of child-bearing age, which is 15 to 49 years old. Pl.'s SOMF, ECF No. 21-2 at 3 ("[Mrs.] Sabra was 46 years old at the time of [Baby M's] birth . . . ."). Due to Mrs. Sabra's advanced age, however, the pregnancy was deemed a risky one. *E.g.*, P. Sabra Decl., ECF No. 52-2 at 3 ¶ 13; Translated Decl. of Samera Sabra ("S. Sabra Decl."), ECF No. 42-3 at 4 ¶ 8. Throughout the high-risk pregnancy, Mrs. Sabra did not have any ultrasounds. P. Sabra Decl., ECF No. 52-2 at 3 ¶ 13 ("I knew that, due to my age, I would be considered at a higher risk for complications"; "[M]y husband and I decided to trust our faith and not have ultrasounds").

In 2019, Baby M was born in Gaza. *Id*. at 3 ¶ 18 ("[Baby M] was born in our home. My mother-in-law and my older daughters

were present at the time.").[4] Mrs. Sabra's neighbor, Dr. [REDACTED]("Dr. [REDACTED]"), arrived at Ms. Sabra's home after Baby M's birth, prescribed Mrs. Sabra post-natal antibiotics, and assisted the family with transporting Baby M to a hospital. *Id.* at 3 ¶¶ 17-19. According to the neighbor, Baby M suffered from certain medical conditions, and she was treated at Al Shifa hospital in Gaza. Decl. of [REDACTED] ("[REDACTED] Decl."), ECF No. 1-3 at 2 ¶ 5.

Moments before Baby M's birth, there was "intense bombing in Gaza City." P. Sabra Decl., ECF No. 52-2 at 3 ¶ 16. The conflict in Gaza, the West Bank, and Israel is well-documented. According to the State Department, "[s]poradic mortar or rocket fire and corresponding Israeli military responses may occur [in Gaza] at any time." *Israel, The West Bank and Gaza Travel Advisory*, U.S. Dep't of State (Dec. 28, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/israel-west-bank-and-gaza-travel-advisory.html [hereinafter "Travel Advisory"].[5] On its website, the State

---

[4] Baby M's date of birth is redacted in the filings to protect her privacy. *See* Fed. R. Civ. P. 5.2(a)(2); *see also* LCvR 5.4(f)(3). The State Department contends that it lacks sufficient information to verify Baby M's date of birth. Def.'s Opp'n, ECF No. 28 at 15; *see also* Pl.'s Reply to Def.'s Counterstatement to Pl.'s SOMF, ECF No. 23-1 at 2.

[5] The Court takes judicial notice of the information on the State Department's official website, which is a "source[] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Humane Soc'y of United States v. Animal &*

Department has cautioned U.S. citizens: "Do not travel to . . .
Gaza due to **terrorism, civil unrest, and armed conflict.**" *Id.;
see also* Decl. of Joshua D. Woda ("Woda Decl."), ECF No. 18-3 at
1 ¶ 4 (explaining that the State Department has a "long-standing
Travel Advisory urging all U.S. citizens not to travel to
Gaza").

"Since 2007, Gaza has been under the de facto control of
Hamas, a U.S. government-designated Foreign Terrorist
Organization ('FTO')." Woda Decl., ECF No. 18-3 at 1 ¶ 4. The
Embassy regularly assists U.S. citizens with leaving Gaza. *Id*.
Because U.S. employees are prohibited from entering Gaza, a U.S.
citizen living in Gaza must obtain a permit from Israeli
authorities to enter Israel where the Embassy is located. *Id*.
Embassy officials travel to Erez Crossing—the entry point
between the Gaza Strip and Israel—every six months to provide
certain services to U.S. citizens, such as "passport services
for newborns and other consular services." *Id*.

### 2. The CRBA and Passport Application Process

On June 11, 2019, Mrs. Sabra contacted the Embassy and
requested an emergency appointment at Erez Crossing to obtain a
CRBA and U.S. passport for Baby M. Pl.'s SOMF, ECF No. 21-1 at

---

*Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 40 n.2
(D.D.C. 2019) (taking judicial notice of documents and other
sources from an agency's government website).

1. During her telephone conversation with an Embassy official, Mrs. Sabra stated that Baby M needed the CRBA and passport for medical treatment in the United States because Baby M had serious health issues. *Id.* The Embassy official then scheduled her appointment, advising Mrs. Sabra to bring certain documentation in support of her applications. *Id.*

On June 12, 2019, Mrs. Sabra attended the scheduled appointment with Joshua D. Woda, a Foreign Service Officer with the State Department and Vice-Consul at the Embassy ("Vice-Consul Woda"). Woda Decl., ECF No. 18-3 at 2 ¶ 8. Vice-Consul Woda served in the Embassy's American Citizen Services ("ACS") passport and citizenship unit, which issues passports and CRBAs. *Id.* at 1 ¶ 1; *see also* 7 FAM 020 App. B (outlining "ACS Responsibilities"). Vice-Consul Woda accepted Mrs. Sabra's applications and supporting documentation on behalf of Baby M. *See, e.g.*, Woda Decl., ECF No. 18-3 at 2 ¶ 8; Passport Application, Def.'s Ex. 2, ECF No. 18-3 at 14-15; CRBA Application, Def.'s Ex. 2 at 20-25.

Mrs. Sabra told Vice-Consul Woda that Baby M's absence was due to her hospitalization. Woda Decl., ECF No. 18-3 at 2 ¶ 9; *see also* Pl.'s SOMF, ECF No. 21-2 at 2. Mrs. Sabra presented a "Pediatric Admission Form," which was primarily written in English, as evidence of Baby M's medical condition, Woda Suppl. Decl., ECF No. 28-2 at 1 ¶¶ 4-6, but Vice-Consul Woda determined

that the document did not appear to be prepared "in the regular course of [Baby M's] medical treatment," Woda Decl., ECF No. 18-3 at 2 ¶ 9. Vice-Consul Woda observed that the form did not indicate the hospital that generated the form, Woda Suppl. Decl., ECF No. 28-2 at 1 ¶ 5, and Vice-Consul Woda concluded that the form was "prepared specifically for presentation to the Embassy" because it is "written entirely in English," *id.* at 1 ¶ 4. Vice-Consul Woda found that the document was "insufficient to demonstrate emergency circumstances and waive the personal appearance of the child" under the applicable regulations. Woda Decl., ECF No. 18-3 at 2 ¶ 9.

### 3. Mrs. Sabra's Initial Documentation

During the June 12, 2019 interview, Mrs. Sabra submitted the following documents in support of the CRBA and passport applications: (1) "a copy and translation of a birth certificate issued on June 10, 2019, by the Palestinian Authority, Ministry of Interior, General Administration of Civil Affairs," Pl.'s SOMF, ECF No. 21-2 at 2; (2) "copies of [Mrs.] Sabra and [Mr.] Sabra's U.S. passport biographical information pages," *id.*; (3) "a power of attorney document executed by Max Sabra on March 6, 2015," *id.*; (4) "a 1995 Connecticut State Marriage Certificate of [Mr.] Sabra and [Mrs. Sabra]," *id.*; and (5) a "Pediatric Admission Form" dated June 9, 2019 and issued by the State of Palestine, Ministry of Health, General Directory of

Hospitals, Def.'s Ex. 6, ECF No. 28-2 at 3.

After reviewing the documents, Vice-Consul Woda advised Mrs. Sabra that the "power of attorney document" failed to comply with the requirement for the consent of both parents for the issuance of a passport to a minor. Woda Decl., ECF No. 18-3 at 3 ¶ 13; *see also* Def.'s Ex. 2, ECF No. 18-3 at 18-19 (showing the "Power of Attorney" document signed by "Max Sabra, A/K/A Mohammed Sabra"). Although Vice-Consul Woda noted that the Palestinian birth certificate appeared, on its face, to be "genuine," the document was issued "well after [Baby M's] birth." Def.'s Ex. 1, ECF No. 18-3 at 8 ("ACS Activity Log"); *see also* Birth Certificate, Def.'s Ex. 1, ECF No. 18-3 at 16-17. Vice-Consul Woda could not verify "[Baby M's] record of birth," which was signed by Dr. Bayan Saleh, Woda Decl., ECF No. 18-3 at 2 ¶ 8, because the Embassy has "no real method of verifying documents issued in the Gaza Strip," Def.'s Ex. 1, ECF No. 18-3 at 8.

According to Vice-Consul Woda, Mrs. Sabra claimed that Baby M was born at a private clinic during the June 12, 2019 interview. Woda Decl., ECF No. 18-3 at 5 ¶ 21. Mrs. Sabra did not provide any documentary evidence of post-natal care during the June 12, 2019 interview. *Id.* at 3 ¶ 10; *see also* Pl.'s SOMF, ECF No. 21-2 at 3. Neither did Mrs. Sabra provide information about the Sabra family's travel plans to the United States for

Baby M's medical treatment. Woda Decl., ECF No. 18-3 at 3 ¶ 10.
Vice-Consul Woda avers that "[Mrs.] Sabra could not explain how
[Baby M] would be able to take a transatlantic flight to the
United States, which would first require overland travel to
Amman, Cairo, or Tel Aviv, when [Baby M] was not well enough to
appear for the interview at the Erez crossing, and appeared to
have no plan [for] the child's travel or subsequent treatment."
*Id.*

In the end, Vice-Consul Woda did not approve the
applications, but Vice-Consul Woda explained to Mrs. Sabra that
"additional evidence of her biological relationship with" Baby M
"could include submission of pre and post-natal medical records,
ultrasounds, and/or photos of [Mrs.] Sabra during her
pregnancy." *Id.* at 3 ¶ 12. Vice-Consul Woda suggested DNA
testing to establish "a mother-child relationship." *Id.* at 3 ¶
13; *see also* Pl.'s Ex. E, ECF No. 3 at 49 ("Proof of biological
relationship"; "we suggest DNA"). Mrs. Sabra, however, "objected
to DNA testing due to the anticipated processing time and stated
that the family could not wait in Gaza for the results." Pl.'s
SOMF, ECF No. 21-2 at 4.

### 4. The Embassy's Concerns with the Submissions

At some point, the Embassy received a discharge record
indicating that Baby M was born in a "private clinic." *E.g.*,
Pl.'s SOMF, ECF No. 21-2 at 3; Pl.'s Ex. F, ECF No. 3 at 51-52

("Place of Birth: Birthing Center"; "Name: Private Clinic"); E-mail from Christina Jump, Esq., to ACS Unit, U.S. Embassy, Jerusalem (June 28, 2019), Pl.'s Ex. I, ECF No. 3 at 66 (stating that "the attached Exhibit A is the discharge record from the clinic where [Baby M] was born, issued and stamped by the Palestinian National Authority, which shows [Mrs.] Sabra and [Mr.] Sabra to be the parents of [Baby M]"). The machine-printed birth certificate contains white-out and a handwritten alteration at box 5 "Place of birth." Pl.'s SOMF, ECF No. 21-2 at 3; *see also* Pl.'s Ex. F, ECF No. 3 at 51. The words "private clinic," in Arabic, were written by hand over the whiteout. Woda Decl., ECF No. 18-3 at 3 ¶ 10; *see also* P. Sabra Decl., ECF No. 52-2 at 4 ¶ 23 ("To the best of my knowledge, the one area that was modified was to reflect that [Baby M] was not actually born at Al Shifa but was born in a private setting, our home, instead."). Vice-Consul Woda determined that the document was not a record of "discharge" from a hospital for Baby M or Mrs. Sabra. Woda Decl., ECF No. 18-3 at 3 ¶ 10.

On June 21, 2019, Mr. Sabra sent an e-mail to the Embassy with documents showing that Mrs. Sabra was prescribed pre-natal vitamins and "documents purporting to show that [she] received fertility treatment in the United States from February to May 2018." Woda Decl., ECF No. 18-3 at 4 ¶ 15; *see also* Pl.'s SOMF, ECF No. 21-2 at 5. Vice-Consul Woda determined that those

documents "were from at least 12 months before [Baby M's] birth, and thus had no bearing on whether [Mrs.] Sabra was actually pregnant, and gave birth to [Baby M]." Woda Decl., ECF No. 18-3 at 4 ¶ 15. Given Mrs. Sabra's claims that Baby M's life was in danger, the Embassy offered to assist the family with obtaining a permit for Baby M in order for her to receive medical treatment in Israel. *Id*. at 4 ¶ 16. The Sabra family declined the Embassy's offer. *See* Pl.'s SOMF, ECF No. 21-2 at 5-6.

On June 25, 2019, the Embassy's ACS Unit received an e-mail from Plaintiff's counsel. *Id*. at 6. Plaintiff's counsel "asserted that DNA testing is against [Mrs.] Sabra's sincerely held religious beliefs as a practicing Muslim and that [Baby M] could not withstand 'either the trip to the Embassy for a DNA sample or the thirty (30) day wait for results articulated by U.S. Embassy officials in Jerusalem – without urgent medical treatment which she cannot receive in Gaza, Baby M is not likely to survive another thirty days.'" *Id*. (citation omitted). In response, on June 28, 2019, the Embassy reiterated its offer to assist the Sabra family to obtain permits from the Israeli government for Baby M's urgent medical treatment. *Id*. Again, the Sabra family declined the Embassy's offer. *See id*.

### 5. The Additional Documentation

On June 28, 2019, Plaintiff's counsel submitted additional documents to the Embassy, including a declaration, dated June

19

25, 2019, from Dr. [REDACTED] at the Al Shifa hospital in the
Gaza Strip concerning Baby M's medical condition. *Id*. To verify
Dr. [REDACTED]'s averments, Vice-Consul Woda called the hospital
on July 1, 2019. Woda Decl., ECF No. 18-3 at 5 ¶¶ 19-20. Vice-
Consul Woda used a translator for the telephone conversation
with Dr. [REDACTED] because he learned that Dr. [REDACTED] did
not speak English. *Id*. at 5 ¶ 20. The declaration was written in
English without an accompanying Arabic translation. [REDACTED]
Decl., ECF No. 1-3 at 2.

Dr. [REDACTED] confirmed to Vice-Consul Woda that he was
Mrs. Sabra's neighbor, and that he received a telephone call
requesting his assistance at the Sabra family home because Mrs.
Sabra was in labor. Pl.'s SOMF, ECF No. 21-2 at 7. The doctor
stated that he arrived at Mrs. Sabra's home after Baby M's
birth. *Id*. The doctor further stated that he was not involved
with the medical care of Baby M, that he had not seen Baby M or
Mrs. Sabra since the day he was called to the home for Baby M's
birth, and that he could not comment on Baby M's condition. *Id*.
Plaintiff's counsel, however, e-mailed the Embassy on July 8,
2019, stating, *inter alia*, that the Embassy officials had
"evidence" that included "Dr. [REDACTED]'s direct statement to
Embassy personnel that he personally delivered Baby [M]." E-mail
from Christina Jump, Esq., to ACS Unit, U.S. Embassy, Jerusalem

(July 8, 2019), Pl.'s Ex. J, ECF No. 3 at 75.[6] The doctor did not personally deliver Baby M, and the doctor did not witness Baby M's birth. Pl.'s SOMF, ECF No. 21-2 at 8.

At some point, Mr. and Mrs. Sabra provided the following documents to support their claim that Baby M is their child: (1) Mr. Sabra's Palestinian national identification card with Baby M listed as his child, Pl.'s Ex. 2, ECF No. 23-2 at 5-8; (2) a "Statement of Consent" form for the issuance of a U.S. passport to a minor under the age of sixteen signed by Mr. Sabra on June 26, 2019, Pl.'s Ex. K, ECF No. 3 at 86-88; (3) a "Physical Exam" document, dated March 2, 2018, stating under the [REDACTED] section that "[REDACTED]," Pl.'s Ex. 1, ECF No. 21-1 at 7; and (4) a photograph of [REDACTED], Pl.'s Ex. 4, ECF No. 23-2 at 12.

The Embassy permitted the Sabra family to submit additional evidence in support of the pending applications. Pl.'s SOMF, ECF No. 21-2 at 8. The Embassy advised Plaintiff's counsel that the CRBA and passport applications would remain open until September 13, 2019. *Id*. And the Embassy explained that the Sabra family could submit a request for a decision on the pending

---

[6] Plaintiff's counsel stated that Dr. [REDACTED] "*is in fact the doctor who delivered Baby [M] when [Mrs.] Sabra went into labor in [2019]; he therefore directly confirmed his personal knowledge that she is the biological mother of Baby [M]*." E-mail from Christina Jump, Esq., to ACS Unit, U.S. Embassy, Jerusalem (July 8, 2019), Pl.'s Ex. J, ECF No. 3 at 75.

applications before the September 2019 deadline. *Id.* Mr. and

Mrs. Sabra, however, did not request the adjudication of the

applications. Woda Decl., ECF No. 18-3 at 6 ¶ 25.

### 6. The Present Lawsuit

Before the Embassy rendered a final decision on the CRBA

and passport applications, Mr. Sabra, as next friend of Baby M,

filed the instant action in this District on July 15, 2019,

seeking declaratory, mandamus, and injunctive relief. *See*

Compl., ECF No. 1 at 2 ¶ 1; *see also* Sealed Compl., ECF No. 3 at

2 ¶ 1. Mr. Sabra asserts three claims for relief. *See* Compl.,

ECF No. 1 at 13-18 ¶¶ 50-77. Count I alleges that Mr. Sabra is

entitled to a "declaratory judgment that [Mr. Sabra] and

[Mrs. Sabra] have sufficiently proven the biological

relationship between themselves and Baby M," *id.* at 13 ¶ 51, and

the Secretary's "failure to provide [Baby M] with a CRBA and

U.S. passport constitutes a violation of her fundamental rights

to citizenship and travel under the Fifth Amendment to the U.S.

Constitution," *id.* at 14 ¶ 57. Count II alleges that Mr. Sabra

is entitled to a writ of mandamus to compel the Secretary to

issue Baby M a CRBA and passport because "[Mr. Sabra] has more

than satisfied the requirement to provide proof of the parent-

child relationship by a preponderance of the evidence." *Id.* at

15 ¶ 59. Count III alleges that Mr. Sabra is entitled to an

injunction to "prevent[] [the Secretary] from further delay of

Baby M's application[s] pending submission to and the results of a DNA test." *Id*. at 18 ¶ 77. In the alternative, Mr. Sabra asserts that the Secretary's request for DNA testing and photographs of Mrs. Sabra during the pregnancy "conflict[s] with [Mr. Sabra's] and his wife's already articulated sincerely held religious beliefs" in violation of RFRA ("Count IV"). *Id*. at 18 ¶ 78.

On July 19, 2019, Chief Judge Beryl A. Howell granted Mr. Sabra's motion for leave to file under seal certain exhibits attached to the complaint. Order, ECF No. 6 at 1-4. On the same day, the case was randomly assigned to this Court. *See generally* Docket for Civ. Action No. 19-2090. On August 1, 2019, Mr. Sabra filed a motion for expedited consideration of the complaint pursuant to Federal Rule of Civil Procedure 57, claiming that "Baby M's health remains at great risk" and "her need for additional medical care remains urgent." Pl.'s Emergency Mot. to Expedite, ECF No. 12 at 4. The next day, on August 2, 2019, this Court held a status conference. *See* Min. Entry of Aug. 2, 2019.

### 7.    The Briefing

Before the status conference, Mr. Sabra agreed to withdraw his emergency motion for expedited consideration, and the parties agreed to an expedited briefing schedule on the merits of the complaint. Joint Status Report, ECF No. 14 at 1 ¶ 4. The Court adopted in part the parties proposed briefing schedule for

cross-motions for summary judgment. *See, e.g.*, Min. Entry of Aug. 2, 2019; Def.'s Mot. for Summ. J. ("Def.'s MSJ"), ECF No. 18; Pl.'s Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 15. After those motions became ripe, the Court held a hearing on August 16, 2019. *See* Min. Entry of Aug. 16, 2019. In recognizing that a "minor . . . who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem," Fed. R. Civ. P. 17(c)(2), this Court appointed Amy Jeffress, Esq., of Arnold & Porter Kaye Scholer LLP as Baby M's guardian *ad litem*, Min. Order of Aug. 16, 2019.[7] The Court directed the Clerk of Court to add Baby M as a petitioner in this case. Min. Order of Aug. 16, 2019.

The Court continued the motions hearing until August 27, 2019, and the Court ordered supplemental briefing on the applicability of 8 U.S.C. § 1503 and the origins of the "biological requirement" in the State Department's Foreign Affairs Manual. Min. Order of Aug. 16, 2019. Mr. Sabra filed his supplemental brief on August 21, 2019, *see generally* Pl.'s Suppl. Mem., ECF No. 30, the government filed its supplemental brief on August 26, 2019, *see generally* Def.'s Suppl. Br., ECF No. 34, the guardian *ad litem* filed a memorandum on behalf of Baby M on August 26, 2019, *see generally* Pet'r's Mem., ECF No.

---

[7] The Court expresses its appreciation to Ms. Jeffress and the law firm of Arnold & Porter Kaye Scholer LLP.

36, and Mr. Sabra filed his reply brief on September 3, 2019,
*see generally* Pl.'s Reply, ECF No. 42.

### 8.    Baby M's Health

Between August 16 and August 27, 2019, the Court directed
Mr. Sabra to provide updates on Baby M's medical condition. *See*
Docket for Civ. Action No. 19-2090. Mr. Sabra, through counsel,
acknowledged the State Department's offer to assist his family
with entering Israel for Baby M's urgent medical treatment. Mot.
Hr'g Rough Tr. (Aug. 16, 2019) at 11. The guardian *ad litem*
"engaged with counsel to pursue alternative avenues to obtain
medical treatment for Baby M as expeditiously as possible."
Pet'r's Mem., ECF No. 36 at 4. Over the course of the
litigation, Baby M's health improved based on Plaintiff's
counsel's representations to the Court. Mr. Sabra, however, did
not provide the Court with written medical records to confirm
Baby M's medical condition. *See* Joint Status Report, ECF No. 32
at 1.

On August 16, 2019, the Secretary advised the Court that
the Sabra family may apply to the United States Customs and
Immigration Services ("USCIS"), a non-party in this case, for
Baby M's humanitarian (medical) parole for entry into the United
States. *See* Min. Order of Aug. 16, 2019; *see also* Def.'s Notice
Regarding Parole, ECF No. 31 at 1. On August 22, 2019, the
Secretary confirmed that it would not deem the parole

application as Mr. Sabra's admission that "Baby M is not a U.S. citizen, an abandonment of any claim to U.S. citizenship asserted by Baby M to date, or a waiver of any right Baby M may have to assert a claim of U.S. citizenship in the future." Def.'s Notice Regarding Parole, ECF No. 31 at 1. On August 23, 2019, the Secretary informed the Court that USCIS did not receive an application for Baby M's humanitarian (medical) parole, but USCIS would expedite any application with notice. Joint Status Report, ECF No. 32 at 3-4.

Based on Mr. Sabra's representations that any written medical "records [for Baby M] are sparse, if in existence at all," *id.* at 1, the Secretary contacted a physician practicing in Gaza who had previously contracted with the Embassy to perform medical examinations for visa applications, Def.'s Status Report, ECF No. 40 at 1. The Secretary confirmed that the physician was willing to perform a physical examination of Baby M and author a report with the results of the examination. *Id.* The Secretary filed under seal the name and contact information of the physician. Def.'s Sealed Notice, ECF No. 45 at 1. At the September 4, 2019 status conference, Plaintiff's counsel did not consent to the independent medical evaluation of Baby M, and Plaintiff's counsel confirmed that Baby M's health was stable.

### 9. The Final Decision

At the Court's direction, the Embassy extended the deadline from September 13, 2019 to October 15, 2019, for the submission of additional evidence in support of the CRBA and passport applications. Joint Status Report, ECF No. 51 at 2. Given Baby M's stable condition, the Embassy offered Mr. and Mrs. Sabra a November 2019 appointment at Erez Crossing in order for the family to present Baby M to the consular officer. *Id.* at 1. The Sabra family declined the offer, and the family suggested a visual inspection via video link rather than Baby M's personal appearance at Erez Crossing. *Id.* at 2. In response, the Embassy decided to adjudicate the CRBA and passport applications after considering the submissions. *Id.* On October 22, 2019, the Embassy sent Mr. and Mrs. Sabra a letter, informing them that: "[t]he documentation and evidence submitted in support of the applications does not sufficiently establish [Baby M's] claim to U.S. citizenship." Letter from Elise B. Greene, ACS, U.S. Embassy Jerusalem, to Ponn Sabra & Mohammed Sabra (Oct. 22, 2019), Ex. A, ECF No. 55-1 at 1 [hereinafter "Final Decision"].

The briefing is now complete, and the motions are ripe and ready for the Court's adjudication.

### III.   Legal Standard

A court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A "material" fact is one capable of affecting the
substantive outcome of the litigation. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is
"genuine" if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id*. If material facts
are genuinely in dispute, or undisputed facts are susceptible to
divergent yet justifiable inferences, summary judgment is
inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir.
2009).

   "The rule governing cross-motions for summary judgment . .
. is that neither party waives the right to a full trial on the
merits by filing its own motion; each side concedes that no
material facts are at issue only for the purposes of its own
motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C.
Cir. 1989) (citation omitted). Summary judgment is appropriate
if the "pleadings, depositions, answers to interrogatories,
admissions on file, and affidavits show that there is no genuine
issue of material fact." *Carter v. Greenspan*, 304 F. Supp. 2d
13, 20 (D.D.C. 2004). "[C]onclusory allegations and
unsubstantiated speculation, whether in the form of a
plaintiff's own testimony or other evidence submitted by a
plaintiff to oppose a summary judgment motion, do not create
genuine issues of material fact." *Mokhtar v. Kerry*, 83 F. Supp.

3d 49, 61 (D.D.C. 2015) (citation and internal quotation marks omitted), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015).

## IV. Analysis

Mr. Sabra moves for summary judgment on Counts I through III, arguing that a declaratory judgment is proper because Baby M is a U.S. citizen and the documentation provided to the Embassy establishes, by a preponderance of the evidence, that Baby M has a biological relationship with Mr. and Mrs. Sabra. Pl.'s Mem. in Supp. of Pl.'s MSJ ("Pl.'s Mem."), ECF No. 15-2 at 3, 8. With respect to Count I, Mr. Sabra contends that the Secretary's failure to recognize Baby M's right to citizenship violates the due process guarantee under the Fifth Amendment. *Id.* at 5. As to Count II, Mr. Sabra argues that a writ of mandamus is appropriate to compel the Embassy to issue the CRBA and passport to Baby M. *Id.* at 10. With respect to Count III, Mr. Sabra urges this Court to enjoin the Secretary from further delay in processing Baby M's applications. *Id.* at 3-4, 9.

The Secretary moves for summary judgment, arguing that the CRBA and passport applications for Baby M are based on a "suspicion of fraud," and that the Embassy reasonably determined that Mr. Sabra must satisfy the State Department's biological relationship requirement for Baby M's entitlement to the CRBA and passport. Def.'s MSJ, ECF No. 18 at 1. The Secretary argues

that summary judgment as to Counts I through IV is appropriate because Mr. Sabra fails to establish a valid claim under the APA, the writ of mandamus statute, or RFRA; thus, there is no basis for the Court to exercise jurisdiction to grant injunctive or declaratory relief. Def.'s Mem. of Law in Supp. of Def.'s MSJ ("Def.'s Mem."), ECF No. 18-1 at 31-32. The Secretary further contends that Mr. Sabra fails to comply with the applicable statutes and regulations that require proof of Baby M's birth, identity, and citizenship. Def.'s Opp'n, ECF No. 28 at 9.

For the reasons explained below, the Court agrees with the Secretary that Mr. Sabra has failed to provide satisfactory proof of Baby M's birth, identity, and citizenship to establish her entitlement to a CRBA and passport under the applicable statutes and regulations, finding no due process violations. The Court disagrees with the State Department's interpretation that the INA requires proof of a biological relationship in this case. The Court disagrees with the Secretary that Mr. Sabra's RFRA claim fails because the evidence shows that the Embassy's request for DNA testing and photographs depicting Mrs. Sabra as pregnant imposed a substantial burden on the religious exercise of Mr. and Mrs. Sabra.

The Court first addresses the three jurisdictional issues: (1) whether Mr. Sabra has standing to pursue his claims; (2) whether this Court has subject-matter jurisdiction; and

(3) whether the doctrine of sovereign immunity bars Mr. Sabra's claims. The Court then turns to the parties' arguments, concluding that: (1) the Secretary is entitled to summary judgment as a matter of law as to Counts I through III; and (2) the Secretary is not entitled to summary judgment as to Count IV because there is a genuine dispute regarding the issue of whether the Embassy's request for the DNA testing and Mrs. Sabra's pregnancy photographs served a compelling interest by the least restrictive means under RFRA.

### A. Subject-Matter Jurisdiction

Before reaching the merits, the Court must confirm its own subject-matter jurisdiction. *Moms Against Mercury v. Food & Drug Admin.*, 483 F.3d 824, 826 (D.C. Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). Lack of standing is a defect in subject-matter jurisdiction. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). "Where both standing and subject matter jurisdiction are at issue, however, a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury*, 483 F.3d at 826.

Mr. Sabra invokes three bases for jurisdiction: (1) 28 U.S.C. § 1331 (federal question); (2) 28 U.S.C. §§ 2201–2202 (declaratory judgment); and (3) 28 U.S.C. § 1361 (mandamus). Compl., ECF No. 1 at 3 ¶ 7, 4 ¶ 8. The Secretary

argues that this Court lacks subject-matter jurisdiction because Mr. Sabra lacks standing, and the Court has no mandamus jurisdiction to order the Secretary to perform a discretionary duty. Def.'s Mem., ECF No. 18-1 at 23-27, 30-31. The Court will address each argument in turn.

### 1. Mr. Sabra Has Standing

The Court begins with the standing analysis. "Article III of the Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010) ("The absence of any one of these three elements defeats standing."). The plaintiff bears the burden of demonstrating constitutional standing. *Steel Co.*, 523 U.S. at 104.

Here, as Baby M's CRBA and passport applications were pending, the Secretary moved for summary judgment on standing and ripeness grounds. *See* Def.'s Mem., ECF No. 18-1 at 23-27. Given the status of the applications, the Secretary argued that this Court lacks subject-matter jurisdiction to hear Mr. Sabra's claims because the Embassy did not issue a decision on the CRBA and passport applications to constitute "final agency action" under the APA. *Id.* at 23. The Secretary only challenged the first prong of Article III standing, arguing that Mr. Sabra failed to demonstrate that he or Baby M suffered any harm or injury from the Embassy's request for additional information in support of the CRBA and passport applications. *Id.* at 24-25. In the Secretary's view, Mr. Sabra lacked standing, and his claims based on the Embassy's action (or inaction) were not ripe for adjudication. *Id.* at 23-27. For the reasons explained below, the Secretary's arguments, however, are moot.

It is undisputed that the Embassy had not issued a decision on the pending applications when the parties filed the cross-motions for summary judgment in August 2019. *See, e.g.*, Def.'s SOMF, ECF No. 18-2 at 6; Pl.'s SOMF, ECF No. 21-2 at 8. It is uncontested that the Embassy extended the deadline for the submission of additional evidence in support of the pending applications to September 2019. *See* Pl.'s SOMF, ECF No. 21-2 at 8; *see also* E-mail from ACS Unit, U.S. Embassy, Jerusalem, to

Christina Jump, Esq. (June 28, 2019), Pl.'s Ex. H, ECF No. 1-10 at 2 (stating that "the application will remain pending until September 13, 2019"). In October 2019, the Embassy issued a final decision on the applications. Final Decision, ECF No. 55-1 at 2. The Court therefore finds that the Secretary's standing and ripeness arguments are moot.

Having found that the Embassy's final decision mooted the Secretary's standing and ripeness arguments, this Court must assure itself that standing exists in this case before proceeding to the merits. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[I]t is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."). For purposes of the standing inquiry, this Court must assume that Mr. Sabra would succeed on the merits of his claims. *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014). ("[I]n reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims.").

Assuming Mr. Sabra's success on the merits, Mr. Sabra easily satisfies Article III standing's first and second prongs—injury-in-fact and causation—because Mr. Sabra challenges the Embassy's denial of the CRBA and passport applications, and Mr. Sabra alleges that he, along with Baby M, suffered a

particularized injury that is fairly traceable to the Embassy's challenged action. *See Lujan*, 504 U.S. at 560-61. The issue of whether Mr. Sabra meets the redressability prong is less straightforward.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Orangeburg v. FERC*, 862 F.3d 1071, 1083 (D.C. Cir. 2017) (citation omitted). Mr. Sabra seeks two forms of relief to redress his injury: (1) a declaratory judgment that Baby M is immediately eligible for U.S. citizenship and that Mr. and Mrs. Sabra have provided the Embassy with sufficient proof of the biological relationship between them and Baby M, Compl., ECF No. 1 at 13 ¶¶ 51-52; and (2) a writ of mandamus compelling the Secretary to issue the CRBA and passport, *id.* at 16 ¶¶ 67-69.[8]

---

[8] Mr. Sabra seeks an injunction prohibiting the Embassy from delaying Baby M's CRBA and passport applications until the submission of DNA testing results. Compl., ECF No. 1 at 18 ¶ 77. The Embassy's October 22, 2019 final decision denying the applications is an "intervening factual event" that renders as moot his request for injunctive relief. *Longwood Vill. Rest., Ltd. v. Ashcroft*, 157 F. Supp. 2d 61, 66 (D.D.C. 2001). Where, as here, "the plaintiff retains some personal stake in the controversy and there are some outstanding issues that a court may resolve, those claims may proceed for review even though an intervening event might have rendered other issues moot." *Id.* In light of the Embassy's final decision, an injunction prohibiting the Embassy from refusing to process Baby M's applications would "accomplish nothing." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008). The Court therefore finds as moot Mr. Sabra's request for injunctive relief. Accordingly, the Court **DENIES**

Mr. Sabra satisfies the redressability prong in seeking a declaratory judgment that Baby M is entitled to U.S. citizenship—such a declaration would redress his injury. *See Orangeburg*, 862 F.3d at 1083. Mr. Sabra, however, fails to satisfy the redressability element with respect to his request for a writ of mandamus.

The parties agree that mandamus relief under 28 U.S.C. § 1361 is a "drastic remedy." Compl., ECF No. 1 at 15 ¶ 61; Pl.'s Mem., ECF No. 15-2 at 10; Def.'s Mem., ECF No. 18-1 at 29-30. Indeed, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has instructed that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation and internal quotation marks omitted). "And it has long been settled that the Mandamus Act is a law of last resort, available 'only if [the plaintiff] has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.'" *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)).

"To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief,

---

Mr. Sabra's motion for summary judgment and **GRANTS** the Secretary's motion for summary judgment as to Count III.

(2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.*; *see also In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) ("Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds."). Mr. Sabra bears "the burden of showing that [his] right to issuance of the writ [of mandamus] is clear and indisputable." *Power*, 292 F.3d at 784 (citation and internal quotation marks omitted).

Assuming, without deciding, that Mr. Sabra has a clear right to relief, Mr. Sabra fails to demonstrate that the Secretary has a clear duty to act. *See Haig v. Agee*, 453 U.S. 280, 282 (1981) ("The right to hold a passport is subordinate to national security and foreign policy considerations, and is subject to reasonable governmental regulation."); *see also* Def.'s Mem., ECF No. 18-1 at 32 (stating that "a U.S. Passport or CRBA certainly qualifies as a 'right or privilege as a national.'" (quoting 8 U.S.C. § 1503)). As a member of this Court explained, "passports are issued to all law-abiding American citizens who apply for them and comply with the rules

prescribed," but "it is not obligatory to issue one to every citizen who desires it." *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 327 (D.D.C. 2018) (citation omitted).

The Secretary correctly notes that "the action sought [in this case] is discretionary, rather than ministerial." Def.'s Mem., ECF No. 18-1 at 31. Indeed, courts have recognized that the issuance of CRBAs and passports falls within the Secretary's discretionary functions. *See, e.g.*, *Alsaidi*, 292 F. Supp. 3d at 327 (finding that the "plaintiff ha[d] not demonstrated that defendants owe[d] her a clear nondiscretionary duty" to renew her U.S. passport where the National Passport Office determined she was not a U.S. citizen); *Retuya v. Chertoff*, No. 8:08-CV-935-T-17EAJ, 2009 WL 10697296, at *4 (M.D. Fla. Sept. 28, 2009) (noting that "passport issuance is a discretionary function exclusively reserved to the Executive Branch"), *aff'd sub nom. Retuya v. Sec'y, Dep't of Homeland Sec.*, 412 F. App'x 185 (11th Cir. 2010); *Nickerson v. United States*, No. CV 07-211 JH/WDS, 2007 WL 9662632, at *5 (D.N.M. Oct. 31, 2007) (explaining that "the consular officer has full authority to either issue or deny a CRBA depending on the officer's subjective opinion whether the applicant has established her claim to nationality").

Congress expressly authorizes the Secretary to determine the citizenship of a person outside of the United States. 8 U.S.C. § 1104(a). Section 211a explicitly provides that "[t]he

Secretary of State *may* grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic and consular officers . . . on behalf of the United States and no other person shall grant, issue, or verify such passports." 22 U.S.C. § 211a (emphasis added); *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency."). Furthermore, "the consular officer *may* issue to the parent or legal guardian" a CRBA based "[u]pon application and the submission of satisfactory proof of birth, identity and nationality." 22 C.F.R. § 50.7(a) (emphasis added).

"Inasmuch as issuance of a passport is a discretionary act," *Southern v. Powell*, No. 03-5197, 2004 WL 434034, at *1 (D.C. Cir. Mar. 2, 2004) (per curiam), Mr. Sabra fails to meet the heavy burden of demonstrating that the Secretary has a clear duty to issue the CRBA and passport to Baby M in order to secure mandamus relief. The Court therefore finds that Mr. Sabra does not satisfy the redressability prong of Article III standing with respect to his request for mandamus relief. Accordingly, the Court **DENIES** Mr. Sabra's motion for summary judgment and **GRANTS** the Secretary's motion for summary judgment as to Count II.

As previously explained, however, Mr. Sabra has met his burden of establishing the redressability element because he seeks declaratory relief that would redress his injury. *See Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 34 (D.D.C. 2018) ("So long as plaintiffs allege some remedy that, were it granted would create some possibility of [relief], plaintiffs will have plausibly pled redressability." (internal citations omitted)). The Court therefore finds that Mr. Sabra has standing to pursue his claims. *See NTCH, Inc. v. FCC*, 841 F.3d 497, 506 (D.C. Cir. 2016) ("Because [the plaintiff] has articulated an injury that is traceable to the [agency's] order and might be redressed by a favorable decision from the court, it has met the requirements of Article III so as to achieve standing[.]"), *cert. denied*, 137 S. Ct. 2277 (2017).

## 2. The Court Has Subject-Matter Jurisdiction

The remaining two sources of jurisdiction—federal question jurisdiction under 28 U.S.C. § 1331 and the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201—confer subject-matter jurisdiction. The Secretary is correct that "a plaintiff may not proceed under the [DJA] alone because it is not an independent source of jurisdiction." Def.'s Mem., ECF No. 18-1 at 31. But the Secretary fails to mention Mr. Sabra's constitutional claims. *See, e.g.*, *id.*; Def.'s Opp'n, ECF No. 28 at 5; Def.'s Reply, ECF No. 29 at 7.

In *Committee on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 81 (D.D.C. 2008), a member of this Court explained that where, as here, "the Constitution is the source of the right allegedly violated, no other source of a right—or independent cause of action—need be identified." And "in most cases a plaintiff would *need* to identify a statutory (or a common law) cause of action to proceed in federal court," *id.*, but that rule is inapplicable in "a case requesting declaratory relief where subject matter jurisdiction was present and a plaintiff's constitutional rights were arguably implicated simply because the plaintiff did not have an independent cause of action apart from the DJA," *id.* at 82.

In this case, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331. Because Mr. Sabra asserts constitutional claims under the Fifth Amendment, *see* Compl., ECF No. 1 at 14 ¶ 57, this Court's jurisdiction "aris[es] under the Constitution . . . of the United States," 28 U.S.C. § 1331. Mr. Sabra argues that "[his] claims, brought under the Fifth Amendment's guarantee of the right to due process, derive from the statutory rights of Baby M to United States citizenship, because she was born abroad to two United States citizens." Pl.'s Opp'n, ECF No. 21 at 9. Mr. Sabra's constitutional rights as well as Baby M's constitutional rights under the Fifth Amendment's Due Process Clause are "arguably implicated" by the Secretary's denial of

the CRBA and passport applications. *Miers*, 558 F. Supp 2d at 82; *see also Shachtman v. Dulles*, 225 F.2d 938, 941 (D.C. Cir. 1955) ("The denial of a passport accordingly causes a deprivation of liberty that a citizen otherwise would have."). Putting aside the DJA, Mr. Sabra may assert his constitutional claims as a separate cause of action. *Cf. Davis v. Passman*, 442 U.S. 228, 242-44 (1979) ("[A] cause of action may be implied directly under the equal protection component of the Due Process Clause of the Fifth Amendment in favor of those who seek to enforce this constitutional right."). Accordingly, the Court has subject-matter jurisdiction.

## B. Sovereign Immunity

The Court next considers the issue of whether Mr. Sabra's claims are barred under the doctrine of sovereign immunity. Under that doctrine, "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *Anderson v. Carter*, 802 F.3d 4, 8 (D.C. Cir. 2015) (citation omitted). The Court has an independent obligation to assure itself of its own jurisdiction, *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017), and that "obligation extends to sovereign immunity because it is 'jurisdictional in nature,'" *id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

The Secretary argues that "the APA is one of the only statutes containing a waiver of the sovereign immunity of the United States, providing a cause of action for individuals aggrieved by agency actions to seek judicial review of final agency decisions." Def.'s Mem., ECF No. 18-1 at 23 (citing *Loeffler v. Frank*, 486 U.S. 549, 554 (1988)).[9] The Secretary goes on to argue that "the United States has waived its sovereign immunity with respect to claims seeking a judicial declaration of citizenship *only* in the specific circumstances in which Congress elected to make such an action available in 8 U.S.C. § 1503, and not otherwise." Def.'s Suppl. Mem., ECF No. 34 at 6.

The Secretary contends—and the Court agrees—that "[t]he only plausible alternative source of a waiver of immunity is the APA." *Id.* at 9; *see also Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (holding that 28 U.S.C. § 1331 does not constitute a waiver of sovereign immunity). The waiver, contained in the relevant section of the APA, provides:

> An action in a court of the United States
> seeking relief other than money damages and
> stating a claim that an agency or an officer

---

[9] The Secretary "understands [Mr. Sabra's] Complaint to include an APA claim." Def.'s Mem., ECF No. 18-1 at 23 ("[T]he claims in Plaintiff's Complaint . . . sound under the APA."). Mr. Sabra argues—and the Court agrees—that the APA "is not relevant in this case because [he] does not bring an APA claim." Pl.'s Opp'n, ECF No. 21 at 7. Mr. Sabra, as the master of the complaint, did not assert claims under the APA. This Court will not construe the operative complaint as asserting such a claim. *See generally* Compl., ECF No. 1 at 13-18 ¶¶ 50-78.

> or employee thereof acted or failed to act in
> an official capacity or under color of legal
> authority shall not be dismissed nor relief
> therein be denied on the ground that it is
> against the United States or that the United
> States is an indispensable party.

5 U.S.C. § 702. "By its own terms, the waiver applies (1) when a
plaintiff claims that 'an agency or an officer or employee
thereof acted or failed to act in an official capacity or under
color of legal authority,' and (2) when the plaintiff 'seek[s]
relief other than money damages.'" *Mackinac Tribe v. Jewell*,
87 F. Supp. 3d 127, 142 (D.D.C. 2015) (quoting 5 U.S.C. § 702),
*aff'd*, 829 F.3d 754 (D.C. Cir. 2016).

Here, Mr. Sabra challenges the Embassy's refusal to issue
the CRBA and passport to Baby M, and Mr. Sabra seeks a
declaratory judgment. Mr. Sabra does not directly address the
Secretary's arguments as to the sovereign immunity issue. *See,
e.g.*, Pl.'s Opp'n, ECF No. 21 at 7-17; Pl.'s Reply, ECF No. 23
at 5-21; Pl.'s Suppl. Mem., ECF No. 30 at 3-9. In his
supplemental brief, however, Mr. Sabra cites *Trudeau v. FTC*,
456 F.3d 178, 187 (D.C. Cir. 2006) and *Chacoty v. Pompeo*, 392 F.
Supp. 3d 1, 12 (D.D.C. 2019) for the proposition that the
"waiver of sovereign immunity is not limited to APA claims."
Pl.'s Suppl. Mem., ECF No. 30 at 9. The Secretary's argument—
that the APA's § 702's waiver is inapplicable here because
"Plaintiff's application has not yet been adjudicated, nor has

44

the time for its adjudication expired," Def.'s Suppl. Mem., ECF No. 34 at 10—has been foreclosed by D.C. Circuit precedent. *See Trudeau*, 456 F.3d at 187 (holding that the waiver of sovereign immunity "applies regardless of whether [the challenged agency action] constitutes 'final agency action'"). Moreover, the Secretary does not dispute that the APA's waiver of sovereign immunity would apply to Mr. Sabra's "claim for a freestanding 'judgment and declaration that Baby M is entitled to U.S. citizenship'" where the Embassy adjudicated the CRBA and passport applications. Def.'s Suppl. Mem., ECF No. 34 at 10. It is undisputed that the Embassy adjudicated those applications and rendered a final decision in October 2019.

Although Mr. Sabra does not assert an APA claim, the APA waives sovereign immunity for a suit brought under 28 U.S.C. § 1331 seeking equitable relief rather than monetary relief for constitutional violations. "It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority." *Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C. Cir. 1984). "Federal courts have subject-matter jurisdiction over suits seeking declaratory and injunctive relief because the APA waives the federal agency's sovereign immunity even when the claim is one directly under the Constitution and not under the

APA." *Bolger v. District of Columbia*, 510 F. Supp. 2d 86, 91 (D.D.C. 2007). Sovereign immunity is not an obstacle to Mr. Sabra's Fifth Amendment claims and request for a declaratory judgment. The Court therefore finds that the doctrine of sovereign immunity does not bar Mr. Sabra's claims in Count I.

### C. The Secretary Is Entitled to Summary Judgment as to Count I

Mr. Sabra moves for summary judgment on the basis that he is entitled to a declaration that Baby M is a U.S. citizen. Pl.'s Mem., ECF No. 15-2 at 91; *see* Compl., ECF No. 1 at 13-14 ¶¶ 51-57. The Secretary moves for summary judgment, arguing that there is no basis for a declaratory judgment in this case. Def.'s Mem., ECF No. 18-1 at 31-33.

The DJA provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added). The Supreme Court has recognized that "[t]his text has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (quoting *Wilton v.*

*Seven Falls Co.*, 515 U.S. 277, 286 (1995)). For the reasons explained below, the Court declines to exercise its discretion under the DJA.

As a threshold matter, the DJA does not provide a cause of action, *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011), and the Act, by itself, is not an independent source of jurisdiction, *Lovitky v. Trump*, 918 F.3d 160, 161 (D.C. Cir. 2019). As previously explained, however, Mr. Sabra may proceed under the DJA because the independent basis of jurisdiction is the Fifth Amendment. *See Miers*, 558 F. Supp 2d at 81-82. Mr. Sabra asserts that the Embassy's refusal to issue the CRBA and U.S. passport to Baby M constitutes a violation of Baby M's fundamental rights to citizenship and travel under the Fifth Amendment. Compl., ECF No. 1 at 14 ¶ 57. Mr. Sabra contends that his due process claims "derive from the statutory rights of Baby M to [U.S.] citizenship, because [Baby M] was born abroad to two [U.S.] citizens." Pl.'s Opp'n, ECF No. 21 at 9 (citing 8 U.S.C. § 1401(c)). Mr. Sabra argues that this "action for a declaratory judgment is available as a remedy to secure a determination of citizenship" because "[t]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself." Pl.'s Suppl. Mem., ECF No. 30 at 5 (quoting *Chacoty*, 392 F. Supp. 3d at 11-12).

In response, the Secretary does not challenge this Court's authority to enjoin unconstitutional acts. Def.'s Suppl. Mem., ECF No. 34 at 7. But the Secretary notes that "[Mr. Sabra] is not asking the Court to 'enjoin an unconstitutional act.'" *Id.* (quoting Pl.'s Suppl. Mem., ECF No. 30 at 5). Rather, "[Mr. Sabra] is asking the Court to declare Baby M a [U.S.] citizen." *Id.* The Secretary argues that Mr. Sabra cannot ignore the INA's procedures set forth in 8 U.S.C. § 1503 that afford Mr. Sabra with judicial relief in the form of a judicial declaration of U.S. citizenship. *See id.* The Secretary contends that Mr. Sabra's request for a judicial declaration that Baby M is a U.S. citizen "*does not hold*" because such "'power to make someone a citizen of the United States has not been conferred upon the federal courts, *like mandamus or injunction*, as one of their generally applicable equitable powers.'" *Id.* (quoting *INS v. Pangilinan*, 486 U.S. 875, 883-84 (1988) (emphasis added)). And the Secretary relies on *Hizam v. Kerry*, 747 F.3d 102, 110 (2d Cir. 2014), in which the Second Circuit made clear that "[c]ourts cannot grant citizenship through their equitable powers." Def.'s Suppl. Mem., ECF No. 34 at 7 (quoting *Hizam*, 747 F.3d at 110). Mr. Sabra does not attempt to distinguish *Pangilinan* or *Hizam*. *See* Pl.'s Reply, ECF No. 42 at 1-6. Before turning to the parties' arguments, the Court first analyzes Mr. Sabra's due process claims.

48

### 1. Mr. Sabra's Due Process Claims

Under the Fifth Amendment, no person shall "be deprived of life, liberty, or property, without due process of the law." U.S. Const. amend. V. To prevail on a due process claim, a plaintiff must demonstrate three elements: (1) "deprivation of a protected liberty or property interest," (2) "by the government," (3) "without the process that is 'due' under the Fifth Amendment." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015). The "plaintiff must show that there was a cognizable liberty or property interest at stake." *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 12 (D.D.C. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).

Mr. Sabra satisfies the first two elements because the Supreme Court has recognized "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125 (1958) (holding that the Secretary of State was not authorized to deny passports to members of the Communist Party). The denial of a passport deprives a U.S. citizen of the right to international travel. *See id.*; *see also Castro v. Freeman*, No. CIV.A. B-09-208, 2011 WL 11535494, at *12 (S.D. Tex. Nov. 22, 2011) (finding that U.S. citizens "have due process interests in their passports and the proper adjudication of those passports"). But the right of international travel is

"no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment . . . [that] can be regulated within the bounds of due process." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978).

The Fifth Amendment's "due process guarantee has both procedural and substantive components." *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018). Because Mr. Sabra does not indicate whether the denial of the CRBA and passport applications constitutes a violation of procedural or substantive due process, *see, e.g.*, Pl.'s Mem., ECF No. 15-2 at 5; Pl.'s Opp'n, ECF No. 21 at 9; Pl.'s Reply, ECF No. 23 at 10-13, the Court analyzes both components.

### a. Procedural Due Process

"Under procedural due process, the government is required to provide individuals with certain procedural rights before it may deprive them of life, liberty, or property." *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 275 n.11 (D.D.C. 2011) (citing *Mathews*, 424 U.S. at 332–33); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner."). "Due process is flexible and calls for such procedural protections as the particular situation

demands." *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Here, Mr. Sabra does not argue that the Embassy failed to provide him with an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong*, 380 U.S. at 552. Neither does Mr. Sabra challenge the applicable statutes or regulations governing the issuance of CRBAs and passports. *See, e.g.*, Pl.'s Opp'n, ECF No. 21 at 7-17; Pl.'s Reply, ECF No. 23 at 5-21; Pl.'s Suppl. Mem., ECF No. 30 at 3-9. Mr. Sabra does not contend that the Embassy did not give him an opportunity to object to the Embassy's adjudication of the CRBA and passport applications or contest the Embassy's decision to deny the applications. *See, e.g.*, Pl.'s Opp'n, ECF No. 21 at 7-17; Pl.'s Reply, ECF No. 23 at 5-21; Pl.'s Suppl. Mem., ECF No. 30 at 3-9. Nor could Mr. Sabra make such arguments on the current record. Before adjudicating the applications, the Embassy extended the deadline for Mr. and Mrs. Sabra to submit additional evidence until September 13, 2019. Pl.'s SOMF, ECF No. 21-2 at 8. After litigation had already begun, the Embassy extended the deadline for additional documentation until October 15, 2019. Joint Status Report, ECF No. 51 at 2.

The Embassy offered Mr. and Mrs. Sabra a November 2019 appointment at Erez Crossing prior to adjudicating the applications. *Id*. at 1. Mr. and Mrs. Sabra declined that

invitation. *Id.* at 1-2. Thereafter, the Embassy provided Mr. and
Mrs. Sabra with written notification denying the CRBA and
passport applications, *see* 22 C.F.R. § 51.65, by issuing the
final decision on October 22, 2019, Final Decision, ECF No. 55-1
at 2. In rendering the decision, the Embassy stated that the
State "Department reviewed and considered all submissions in
support of the pending applications made to the U.S. Embassy . .
. and as part of the pending litigation in [this case]." *Id.*

The Secretary points out that "an individual has no right,
clear or otherwise, to be issued a U.S. passport—and the
Secretary of State has no duty to issue one—unless he [or she]
complies with the controlling rules and regulations and
established that that he [or she] meets the requirements."
Def.'s Opp'n, ECF No. 28 at 8. According to the Secretary,
"[Mr. Sabra] has not complied with all of these requirements."
*Id.* at 9. For instance, it is undisputed that Baby M did not
attend the interview with Mrs. Sabra and Vice-Consul Woda at
Erez Crossing on June 12, 2019. Pl.'s SOMF, ECF No. 21-1 at 2.
Section 51.28(a) requires the personal appearance of a minor
under the age of sixteen "unless the personal appearance is
specifically excused by a senior passport officer, pursuant to
guidance issued by the Department." 22 C.F.R. § 51.28(a).
Mr. Sabra points out that the FAM permits an exception for
emergency circumstances, Pl.'s SOMF, ECF No. 21-1 at 2-3, but

the consular officer decides whether to exercise his or her discretion to waive the personal appearance requirement, *id*. And Vice-Consul Woda did not excuse Baby M's personal appearance. *Id*.; *see also* Woda Decl., ECF No. 18-3 at 2 ¶ 9. Furthermore, Mr. and Mrs. Sabra did not present Baby M for a subsequent interview with the Embassy in November 2019 at Erez Crossing following the stabilization of Baby M's health condition. *See* Joint Status Report, ECF No. 51 at 2.

Because the Embassy afforded Mr. and Mrs. Sabra with a meaningful opportunity to contest the Embassy's refusal to issue the CRBA and passport to Baby M, the Court therefore finds that Mr. Sabra fails to demonstrate that the Embassy's actions did not comport with procedural due process.

### b. Substantive Due Process

"Substantive due process bars government interference with certain fundamental rights 'regardless of the fairness of the procedures used to implement them.'" *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 499 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "There are two strands of the substantive due process doctrine." *Id*. (citation and internal quotation marks omitted). "The first strand protects rights that are 'fundamental,' whereas the second 'protects against the exercise of governmental power that shocks the conscience.'" *Id*. (citation omitted); *see also Cty. of Sacramento v. Lewis*, 523

U.S. 833, 849 (1998) (explaining that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level").

The Court assumes that Mr. Sabra invokes the "fundamental" rights strand of substantive due process because Mr. Sabra does not argue that the Embassy's actions rise to the level of shocking the conscience. *See Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 499. Assuming, without deciding, that Baby M is a U.S. citizen, the Embassy's denial of Baby M's CRBA and passport applications restricted her right to international travel. Such a right is not equivalent to the fundamental right of interstate travel, however. *See, e.g.*, *Haig*, 453 U.S. at 306-07; *Weinstein v. Albright*, 261 F.3d 127, 140 (2d Cir. 2001) ("Plaintiff's right to a passport and to travel internationally, while a liberty interest protected by the Due Process Clause of the Fifth Amendment, is not a fundamental right equivalent to the right to interstate travel."). As the D.C. Circuit has explained, "international travel is no more than an aspect of liberty that is subject to reasonable government regulation within the bounds of due process, whereas interstate travel is a fundamental right subject to a more exacting standard." *Hutchins v. District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (citing *Haig*, 453 U.S. at 306-07). As a matter of law, the right

to international travel is not a fundamental one. *Haig*, 453 U.S. at 306-07.

Mr. Sabra's remaining claim is that the Embassy's failure to issue Baby M's CRBA and passport constitutes a violation of Baby M's "fundamental" right to citizenship. *See* Compl., ECF No. 1 at 14 ¶ 57. In dicta, the Supreme Court has discussed the "the fundamentality of citizenship." *Tuaua v. United States*, 951 F. Supp. 2d 88, 95 n.11 (D.D.C. 2013) (citing *Trop v. Dulles*, 356 U.S. 86, 103 (1958) (plurality opinion); *Afroyim v. Rusk*, 387 U.S. 253, 267-68 (1967)), *aff'd*, 788 F.3d 300 (D.C. Cir. 2015). "When the Government acts to take away the fundamental right of citizenship, the safeguards of the Constitution should be examined with special diligence." *Trop*, 356 U.S. at 103; *see also Afroyim,* 387 U.S. at 267-68 ("Citizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power."). Mr. Sabra does not cite any case law for the proposition that citizenship is a fundamental right. *See* Pl.'s Opp'n, ECF No. 21 at 9-10. As such, Mr. Sabra has failed to establish a fundamental right to citizenship. To the extent Mr. Sabra asserts a violation of substantive due process, Mr. Sabra has not established that the government infringed on a "fundamental" right.

Even assuming, *arguendo*, that Mr. Sabra established a due process violation, Mr. Sabra does not provide a basis for a declaratory judgment on the current record. Seeking a judicial declaration of U.S. citizenship, Mr. Sabra argues that his due process claims derive from Baby M's rights to U.S. citizenship under 8 U.S.C. § 1401(c). Pl.'s Opp'n, ECF No. 21 at 9. In Mr. Sabra's view, Baby M automatically became a U.S. citizen at birth because Section 1401(c) makes clear that a person "shall" be a citizen at birth where: "a person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . ., prior to the birth of such person." Pl.'s Mem., ECF No. 15-2 at 7 (quoting 8 U.S.C. § 1401(c)). Mr. Sabra contends that Section 1401(c) does not require proof of a "blood relationship" between the child and the U.S. citizen parents. *Id*. Mr. Sabra relies on *Miller v. Albright*, 523 U.S. 420 (1998) for the proposition that a "blood relationship to the birth mother is immediately obvious and is typically established by hospital records and birth certificates." *Id*. at 8 (quoting *Miller*, 523 U.S. at 436).

The State Department has interpreted 8 U.S.C. §§ 1401 and 1409 to require proof of a biological parent-child relationship. *See, e.g.*, Def.'s Opp'n, ECF No. 28 at 18 (citing 8 FAM § 301.4-1(B)); Def.'s Suppl. Mem., ECF No. 34 at 23 (arguing that "[t]he

phrase 'born . . . of parents' as set forth in Section 1401(c)

(emphasis added) has an inherently biological connotation"). The

FAM states that "[a]bsent a blood relationship between the child

and the parent on whose citizenship the child's own claim is

based, U.S. citizenship is not acquired." 8 FAM § 301.4-

1(D)(1)(a). In addition, the FAM provides: "Children born in

wedlock are generally presumed to be the issue of that marriage.

This presumption is not determinative in citizenship cases,

however, because an actual biological relationship to a U.S.

citizen parent is required." 8 FAM § 301.4-1(D)(1)(d).

According to the Secretary, "the State Department applies a

preponderance-of-the-evidence standard, in which 'evidence of

blood relationship is of greater weight than the evidence to the

contrary.'" Def.'s Mem., ECF No. 18-1 at 18 (quoting 8 FAM

§ 301.4-1(D)(b)(2)). The Secretary explains that the origins of

the "biological requirement" in the FAM are rooted in "the

traditional Roman Civil Law concept of *jus sanguinis*," and the

State Department's longstanding "understanding" of the blood

requirement "is evidenced by archival copies of the [FAM] from

the early 1970s, as well as earlier guidance sent to diplomatic

posts in the 1960s and reflects the biological and social

realities of the era predating the rise of assisted reproductive

technology." Def.'s Suppl. Mem., ECF No. 34 at 20.

The historical underpinnings of the FAM do not persuade this Court that Section 1401(c) requires proof of a biological relationship. *Cf. Jaen v. Sessions*, 899 F.3d 182, 190 (2d Cir. 2018) (concluding that "a blood relationship is not required to establish parentage for purposes of acquired citizenship when the child is born into marriage"). Indeed, courts have rejected the Secretary's interpretation that the phrase "born . . . of parents" in Section 1401 requires a "biological" or "blood" relationship between a child and a U.S. citizen parent for purposes of citizenship. *E.g., Scales v. INS*, 232 F.3d 1159, 1164 (9th Cir. 2000) (holding that "[a] straightforward reading of § 1401 indicates . . . that there is no requirement of a blood relationship"); *Dvash-Banks v. Pompeo*, No. CV 18-523-JFW(JCX), 2019 WL 911799, at *7 (C.D. Cal. Feb. 21, 2019) (same), *appeal filed*, No. 19-55517 (9th Cir. May 6, 2019); *cf.* Mot. Hr'g Tr. at 6-7, 34, 38, *Blixt v. U.S. Dep't of State*, Civ. Action No. 18-124 (D.D.C. May 21, 2019), ECF No. 38 (Sullivan, J.) (denying the State Department's motion to dismiss).

The D.C. Circuit has indicated that "informal documents" like the FAM and the State Department's Foreign Affairs Handbook are distinct from "rules or regulations" accorded deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Miller v. Clinton*, 687 F.3d 1332, 1341 (D.C. Cir. 2012); *see also Dvash-Banks*, 2019 WL 911799, at

*5 ("The FAM represents the State Department's unilateral declarations and is not the product of a formal adjudication or notice-and-comment rulemaking or congressional action."). The Secretary argues—and the Court disagrees—that "[t]he State Department's interpretation of the INA provisions governing acquisition of U.S. citizenship abroad . . . should thus be given deference." Def.'s Suppl., ECF No. 34 at 26 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

The State Department's interpretation of the relevant INA provisions lacks the "power to persuade" under *Skidmore*'s less deferential standard because the plain language of 8 U.S.C. § 1401 does not require proof of a "biological relationship" between the child born abroad to married U.S. citizen parents. *Skidmore*, 323 U.S. at 140. This Court joins the other courts in declining to defer to the FAM. *See, e.g.*, *Jaen*, 899 F.3d at 187 n.4; *Scales*, 232 F.3d at 1165–66; *Chacoty*, 392 F. Supp. 3d at 15. To the extent the Embassy required Mr. and Mrs. Sabra to prove a blood or biological relationship, *see* Pl.'s Ex. E, ECF No. 3 at 49, such evidence is not required under Section 1401(c), *see* 8 U.S.C. § 1401(c).[10]

---

[10] Having found that Section 1401(c) does not require a "biological relationship," *see* 8 U.S.C. § 1401(c), the Court finds as moot Mr. Sabra's request for a judicial declaration that "he and his wife have sufficiently proven the biological relationship between themselves and Baby M." Compl., ECF No. 1 at 13 ¶ 51. For the same reasons, the Court need not address

That being said, the Court agrees with the Secretary that the Embassy's "demand here" for additional information was "sensible even if there were no biological-relationship requirement." Def.'s Suppl. Mem., ECF No. 34 at 27. Congress granted the Secretary with the authority to determine the citizenship of a person not in the United States. 8 U.S.C. § 1104. Mr. Sabra bears the burden of demonstrating that Baby M is a U.S. citizen, *see* 22 C.F.R. § 51.40, and Mr. Sabra "*must* provide documentary evidence that [Baby M] is a U.S. citizen," *id.* § 51.41 (emphasis added). And Mr. Sabra "*shall* be required to submit *proof* of the child's *birth, identity and citizenship* meeting the evidence requirements" in order for Baby M to receive a CRBA and U.S. passport. 22 C.F.R. § 50.5 (emphasis added). In the absence of "*satisfactory proof of birth, identity and nationality*," the consular officer retains the discretion to deny the CRBA and passport to the parent or legal guardian. 22 C.F.R. § 50.7(a) (emphasis added). The applicable statutes or regulations do not require the State Department to accept documents as proof of birth, identity, and citizenship if those documents raise concerns of authenticity and reliability.

---

Mr. Sabra's argument that the Embassy improperly applied a "clear and convincing evidence" standard for proof of the biological relationship. *See* Pl.'s Opp'n, ECF No. 21 at 8-9.

On the current record, the Court is not persuaded that the Embassy's request for additional documentation runs afoul of due process given that the State Department may request additional evidence for proof of citizenship. *See, e.g.*, 22 C.F.R. § 51.45; 22 C.F.R. § 51.23(c). After reviewing Mr. and Mrs. Sabra's submissions and the filings in this case in support of the CRBA and passport applications, the Embassy determined that Mr. Sabra failed to present satisfactory proof of Baby M's birth, identity, and citizenship. *See* Final Decision, ECF No. 55-1 at 2. It is true that "an authentic copy of the record of the birth filed with local authorities" typically qualifies as proof of the child's birth. 22 C.F.R. § 50.5(a). It is undisputed that Mrs. Sabra submitted to the Embassy "Baby M's official Palestinian birth certificate." Pl.'s Opp'n, ECF No. 19 at 11. Mr. Sabra argues that the State Department's regulations advise that the Embassy should accept the Palestinian birth certificate "[e]ven in an instance of suspected fraud." *Id.* at 15. Mr. Sabra goes on to argue that "there is no deceit, or drama, or detective work needed" here because "there are simply two U.S. citizens seeking to care for their ill and minor child, born of their marriage and statutorily entitled to her rights of U.S. citizenship." *Id.*

The Secretary does not dispute that Mr. and Mrs. Sabra are U.S. citizens, and that Mr. Sabra "had a residence in the United

States" before Baby M's birth. Def.'s Suppl. Mem., ECF No. 34 at
17 (quoting 8 U.S.C. § 1401(c)). The Secretary acknowledges that
"a birth certificate can usually [be] accepted as primary
evidence of parentage where there are no indicia of potential
fraud and no contradictory evidence or information." Def.'s
Opp'n, ECF No. 28 at 15-16. The Secretary points out that the
Palestinian birth certificate was "issued more than a month
after [Baby M's] alleged date of birth," *id.* at 15, but the
relevant regulation that applies to persons born outside of the
United States does not provide a reasonable timeframe for the
issuance of a birth certificate, *see* 22 C.F.R. § 50.5(a).
Nonetheless, the Secretary points out that Vice-Consul Woda
could not verify the information contained in the Palestinian
birth certificate as it is a document issued by the Hamas-
affiliated Ministry of the Interior, and Hamas is a designated
Foreign Terrorist Organization. Def.'s Suppl. Mem., ECF No. 34
at 27.

Mr. Sabra's argument—that the Embassy should accept the
Palestinian birth certificate as evidence of Baby M's birth,
identity, and citizenship—is unavailing. Putting aside Vice-
Consul Woda's concerns with the Palestinian birth certificate,
Mr. Sabra fails to acknowledge the State Department's discretion
to require additional evidence as proof of birth, identity, and
citizenship. *See, e.g.*, Pl.'s Opp'n, ECF No. 21 at 7-17; Pl.'s

Reply, ECF No. 23 at 5-21; Pl.'s Suppl. Mem., ECF No. 30 at 3-9. Section 51.23(c) provides that the State Department "may" require a passport applicant to provide "additional evidence of identity as it deems necessary." 22 C.F.R. § 51.23(c). The same is true for additional evidence of U.S. citizenship. *See* 22 C.F.R. § 51.45. Indeed, the Embassy found it necessary to request additional evidence. *See* Def.'s Suppl. Mem., ECF No. 34 at 27.

The Court cannot ignore that Mr. Sabra has failed to provide critical information, specifically Baby M's written medical records to substantiate Baby M's birth and health condition. Plaintiff's counsel stated on the record that "[she] haven't seen the medical records." Mot. Hr'g Rough Tr. (Aug. 16, 2019) at 105. Mr. and Mrs. Sabra declined the State Department's invitation to enlist the services of the medical doctor practicing in Gaza who has previously contracted with the Embassy to perform a medical examination and issue a written report. *See* Def.'s Status Report, ECF No. 40 at 1-4. Dr. [REDACTED] describes Baby M's condition in general terms, *see* Sealed [REDACTED] Decl., ECF No. 3 at 21, but Dr. [REDACTED]'s declaration is not accompanied by supporting written medical records, *see* Def.'s Reply, ECF No. 29 at 14. The Secretary correctly points out that Dr. [REDACTED]'s declaration is "written in English and contains no indication that it was

translated from Arabic." Def.'s Opp'n, ECF No. 28 at 16. But it is undisputed that Vice-Consul Woda used a translator to speak with Dr. [REDACTED] on July 1, 2019, because Dr. [REDACTED] does not speak English. *Id.* Furthermore, Dr. [REDACTED] "declare[s] under penalty of perjury that the foregoing is true and correct based on [his] personal knowledge," Sealed [REDACTED] Decl., ECF No. 3 at 21, but Dr. [REDACTED]'s declaration fails to comply with 28 U.S.C. § 1746, *see id.*[11]

The Pediatric Admission Form is problematic because it is not accompanied by any written medical records and there is no indication whether a medical provider generated the form. Def.'s Ex. 6, ECF No. 28-2 at 3. The Pediatric Admission Form states that Baby M was "referred from Al Durra Hospital" with a certain condition, and "[p]resented to Al Durra Hospital" with respiratory distress. *Id.* According to Vice-Consul Woda, the

---

[11] Section 1746(1) provides specific language for declarations: "If executed without the United States: 'I declare (or certify, verify, or state) under penalty of perjury *under the laws of the United States of America* that the foregoing is true and correct. Executed on (date). (Signature)'." 28 U.S.C. § 1746(1) (emphasis added). "Under this statute, any declaration executed outside of the United States must state either that it is made 'under penalty of perjury under the laws of the United States of America' or a substantially similar form." *In re Korean Air Lines Co., Ltd. Antitrust Litig.*, No. CV0705107SJOAGRX, 2013 WL 12216516, at *2 (C.D. Cal. Dec. 6, 2013). In this case, Dr. [REDACTED] executed the declaration outside of the United States, Pl.'s SOMF, ECF No. 21-2 at 6, and Mr. Sabra did not file an amended declaration on behalf of Dr. [REDACTED] to comply with 28 U.S.C. § 1746. *See generally* Docket for Civ. Action No. 19-2090.

Pediatric Admission Form does not contain Baby M's "diagnosis or treatment from either hospital." Woda Suppl. Decl., ECF No. 28-2 at 1 ¶ 6. With the exception of Baby M's name, the header, and the address, the Pediatric Admission Form is written in English. Def.'s Ex. 6, ECF No. 28-2 at 3. Vice-Consul Woda "concluded from this that the [Pediatric Admission Form] was prepared specifically for presentation to the Embassy rather than in the regular course of [Baby M's] medical treatment." Woda Suppl. Decl., ECF No. 28-2 at 1 ¶ 4.

Mr. Sabra did not attach the Pediatric Admission Form as an exhibit to the complaint. *See generally* Compl., ECF No. 1. After the Secretary attached the Pediatric Admission Form to Vice-Consul Woda's supplemental declaration, *see* Def.'s Ex. 6, ECF No. 28-2 at 3, Mr. Sabra subsequently filed a declaration from Mrs. Sabra with the Pediatric Admission Form as an exhibit, *see* Pl.'s Ex. L, ECF No. 52-2 at 16. According to Mrs. Sabra, "[Baby M] was diagnosed with "[REDACTED]." P. Sabra Decl., ECF No. 52-2 at 4 ¶ 26. Mrs. Sabra avers that the form was created on June 9, 2019 in her presence for Baby M's admission to Al Shifa hospital, *id.*, and she was not given any medical records, *id.* at 4 ¶ 27. It is not apparent whether a medical provider generated the form. *See* Pl.'s Ex. L, ECF No. 52-2 at 16.

In his reply brief, Mr. Sabra does not address the issues raised by Vice-Consul Woda with respect to the Pediatric

Admission Form. *See* Pl.'s Reply, ECF No. 23 at 20. Rather, Mr. Sabra argues that Vice-Consul Woda's supplemental declaration violates the so-called "sham affidavit rule," *id.*, which "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony," *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (citation and internal quotation marks omitted). "[F]or the doctrine to apply, 'the affidavit must *clearly contradict* prior sworn testimony, rather than clarify confusing or ambiguous testimony.'" *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160-61 (D.D.C. 2008) (quoting *Hinch v. Lucy Webb Hayes Nat. Training Sch.*, 814 A.2d 926, 930 (D.C. 2003) (emphasis added)).

Here, Mr. Sabra argues that the Secretary fails to provide a "compelling reason" for Vice-Consul Woda's "contradictions or original failure to provide the Pediatric Admission Form." Pl.'s Reply, ECF No. 23 at 20. The Secretary concedes Mr. Sabra's argument by not responding to it. *See* Def.'s Reply, ECF No. 29 at 5-20. Nonetheless, Mr. Sabra fails to point to what specific averments in Vice-Consul Woda's first declaration clearly contradict his statements in the supplemental declaration. *See* Pl.'s Reply, ECF No. 23 at 20. Mr. Sabra appears to take issue

with Vice-Consul Woda's amendment as to whether he retained the
Pediatric Admission Form after the June 12, 2019 interview with
Mrs. Sabra. *See id.* In his first declaration, Vice-Consul Woda
avers that the Pediatric Admission Form was "*not retained.*" Woda
Decl., ECF No. 18-3 at 2 ¶ 9 (emphasis added). In his
supplemental declaration, however, Vice-Consul Woda declares
that "[he] subsequently recalled that [he] took a photograph of
that document, a true and correct copy of which is attached as
Exhibit 6." Woda Suppl. Decl., ECF No. 28-2 at 1 ¶ 3. Vice-
Consul Woda does not aver that he retained a physical copy of
the Pediatric Admission Form. *See id.*

Having reviewed Vice-Consul Woda's declarations, the Court
disagrees that the new information warrants a finding that Vice-
Consul Woda's supplemental declaration is a "sham affidavit." As
the D.C. Circuit has explained, the sham affidavit rule can be
misapplied where a "supplemental declaration presented *new*
information rather than contradictory information." *U.S. Dep't
of Justice v. Daniel Chapter One*, 650 F. App'x 20, 25 (D.C. Cir.
2016). Vice-Consul Woda provided new information in the form of
a photograph of the Pediatric Admission Form to support his
supplemental declaration. *See* Woda Suppl. Decl., ECF No. 28-2 at
1 ¶ 3. Even if the Court deemed Vice-Consul Woda's supplemental
declaration as a "sham affidavit," the Court could consider the
Pediatric Admission Form because that document is attached as an

exhibit to Vice-Consul Woda's supplemental declaration and Mrs. Sabra's declaration. *Compare* Def.'s Ex. 6, ECF No. 28-2 at 3, *with* Pl.'s Ex. L, ECF No. 52-2 at 16. Mr. Sabra does not oppose the introduction of the Pediatric Admission Form. *See* Pl.'s Reply, ECF No. 23 at 20. Even if the Court did not consider Vice-Consul Woda's supplemental declaration, the issues with the Pediatric Admission Form remain the same.

The current record contains the following inconsistencies that support the Embassy's final decision that Mr. and Mrs. Sabra's submissions are insufficient proof of Baby M's birth, identity, and citizenship: (1) Mr. Sabra avers that Baby M "[REDACTED]," Decl. of Mohammed Sabra ("M. Sabra Decl."), ECF No. 21-1 at 2 ¶ 9, but the Pediatric Admission Form clearly states that [REDACTED]," Def.'s Ex. 6, ECF No. 28-2 at 3; (2) Mr. Sabra's Statement of Material Facts provides that "Dr. [REDACTED] delivered Baby M at her birth," Pl.'s Reply to Def.'s Counterstatement to Pl.'s SOMF, ECF No. 23-2 at 4 ¶ 12, but Mrs. Sabra avers that "Dr. [REDACTED] arrived moments after [Baby M] was born," P. Sabra Decl., ECF No. 52-2 at 3 ¶ 19, and it is undisputed that Dr. [REDACTED] did not witness Baby M's birth, Pl.'s SOMF, ECF No. 21-2 at 7; and (3) the "discharge record" has the handwritten words "Private Clinic" in Arabic over whiteout as Baby M's place of birth, Pl.'s Ex. F, ECF No. 3 at 51-52, but Mrs. Sabra avers that Baby M was born at home, P.

Sabra Decl., ECF No. 52-2 at 3 ¶ 18. The Secretary correctly points out that "[n]othing the Sabras provided to the Embassy or the Court prior to [Mr. Sabra's] opposition papers . . . reflected a home birth." Def.'s Rely, ECF No. 29 at 11.

The Court is troubled by Mr. Sabra's failure to explain the lack of travel arrangements or plans in the current record for follow-up medical treatment in the United States given that Mr. Sabra asserts there is a need for Baby M's urgent medical treatment in the United States. *See* Pl.'s Mem., ECF No. 15-2 at 3. Dr. [REDACTED], one of the medical providers for Baby M, "[REDACTED]." [REDACTED] Decl., ECF No. 3 at 21 ¶ 8. According to Dr. [REDACTED], the hospital where Baby M was located "simply does not have the resources or equipment available to provide [Baby M's] medical needs." *Id.*; *see also* P. Sabra Decl., ECF No. 52-2 at 4 ¶ 28 ("The doctors at Al Shifa recommended we get [Baby M] better treatment in the United States."). Mr. Sabra avers that "[w]e just want to bring our daughter [Baby M] home to the United States, and get her the best medical treatment we can." M. Sabra Decl., ECF No. 21-1 at 5 ¶ 15; *see also* M. Sabra Suppl. Decl., ECF No. 23-2 at 2 ¶ 12 ("As I stated earlier, [we] want to bring our daughter home to the United States, and get her the best medical treatment we can.").

The current record is devoid of any travel plans to nearby countries with ample resources and the necessary equipment for

Baby M's urgent medical treatment. *See* Def.'s Reply, ECF No. 29 at 14. The Secretary correctly points out that Mr. Sabra's averment, *see* M. Sabra Decl., ECF No. 21-1 at 5 ¶ 15, is "inconsistent" with "the fact that the Sabras have been unable to demonstrate any plan for safely transporting [Baby M] to the United States or for any medical follow up that has been scheduled with medical providers in the United States." Def.'s Reply, ECF No. 29 at 14. It is undisputed that the Embassy offered to assist Mr. and Mrs. Sabra with obtaining permits to enter Israel for Baby M's medical treatment there, and that the Sabra family declined the Embassy's offer. *See, e.g.*, Woda Decl., ECF No. 18-3 at 4 ¶ 16; Pl.'s SOMF, ECF No. 21-2 at 5-6. Mr. and Mrs. Sabra did not apply for Baby M's humanitarian (medical) parole with USCIS, which would have been another avenue to gain entry into the United States for Baby M's medical treatment. Joint Status Report, ECF No. 32 at 3-4.

*     *     *

Under the unique facts and circumstances of this case, the Court finds that Mr. Sabra has failed to provide sufficient documentation as proof of Baby M's birth, identity and citizenship, as required by the applicable statutes and regulations. What is more, Mr. Sabra does not address the Supreme Court precedent that instructs that federal courts may not declare a person a citizen under its equitable powers. *See*

Def.'s Suppl. Mem., ECF No. 34 at 7 (citing *Pangilinan*, 486 U.S. at 883-84); *see also* Pl.'s Reply, ECF No. 42 at 1-6. Accordingly, the Court **DENIES** Mr. Sabra's motion for summary judgment and **GRANTS** the Secretary's motion for summary judgment as to Count I.[12]

### D. The Secretary Is Not Entitled to Summary Judgment as to Count IV

Mr. Sabra alleges that the Embassy's failure to issue a CRBA and U.S. passport to Baby M violates his "rights to free exercise of religion" under RFRA. Compl., ECF No. 1 at 18 ¶ 78. The Secretary moves for summary judgment on Mr. Sabra's RFRA claim, Def.'s Mem., ECF No. 18-1 at 27-29, but Mr. Sabra does not move for summary judgment on his RFRA claim, *see* Pl.'s Mem., ECF No. 15-2 at 3-11.[13]

---

[12] The Secretary's argument—that Mr. Sabra must exhaust his administrative remedies under 8 U.S.C. § 1503 before bringing his claims in this action, *see* Def.'s Reply, ECF No. 29 at 6-7— is unavailing. The Secretary cites no controlling authority for the proposition that a plaintiff must pursue Section 1503 claims before asserting stand-alone due process claims. *See* Def.'s Suppl. Mem., ECF No. 34 at 14. Mr. Sabra may take advantage of the INA's enumerated procedures under 8 U.S.C. § 1503. But, as the master of his complaint, Mr. Sabra did not assert a Section 1503 claim. *See generally* Compl., ECF No. 1 at 13-18 ¶¶ 50-78.

[13] The Court rejects Mr. Sabra's argument—that the RFRA claim "is not part of what [he] sought to have expedited," Pl.'s Opp'n, ECF No. 21 at 7—because the Court adopted in part the parties' expedited cross-motions for summary judgment briefing schedule on the claims in the complaint. *See* Min. Entry of Aug. 2, 2019; *see also* Joint Status Report, ECF No. 14 at 1-2 ¶ 4 ("On August 2, 2019, undersigned counsel for Defendant called counsel for Plaintiff to propose an expedited briefing schedule *on the merits of the Complaint* in exchange for Plaintiff agreeing to

Congress enacted RFRA in 1993 to "provide greater
protection for religious exercise than is available under the
First Amendment." *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015).
RFRA provides that the "[g]overnment shall not substantially
burden a person's exercise of religion even if the burden
results from a general rule of applicability," unless the
government "demonstrates that application of the burden . . .
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling
governmental interest." 42 U.S.C. § 2000bb-1(a), (b). Any
"person whose religious exercise has been burdened in violation
of [the statute] may assert that violation as a claim or defense
in a judicial proceeding and obtain appropriate relief against
[the] government." 42 U.S.C. § 2000bb-1(c).

"A person who brings a challenge under RFRA bears the
initial burden of proving that (1) the Government's policy or
action implicates her religious exercise, (2) the relevant
religious exercise is grounded in a sincerely held religious
belief, and (3) the policy or action substantially burdens that
exercise." *Standing Rock Sioux Tribe v. U.S. Army Corps of
Engineers*, 239 F. Supp. 3d 77, 88 (D.D.C. 2017). If the person

---

withdraw his emergency motion. The parties agreed, and therefore
propose to the Court that the parties file cross motions for
summary judgment on August 12, 2019, and that written
oppositions/replies be waived.") (emphasis added).

establishes a *prima facie* RFRA violation, then the burden shifts
to the government to demonstrate that the government interest is
compelling, and its action is the least restrictive means. *Id.*
The Court first analyzes whether Mr. Sabra satisfies his initial
burden, concluding that the evidence demonstrates that the
Embassy imposed a substantial burden on the religious exercise
of Mr. and Mrs. Sabra.

### 1. Religious Exercise

Congress has defined the term "religious exercise" to mean
"any exercise of religion, whether or not compelled by, or
central to, a system of religious belief." 42 U.S.C. § 2000cc–
5(7)(A), *incorporated by* 42 U.S.C. § 2000bb–2(4); *see also*
*Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001)
(explaining that RFRA incorporates the definition from the
Religious Land Use and Institutionalized Persons Act, 42 U.S.C.
§ 2000cc *et seq*.). Here, Mr. and Mrs. Sabra have expressed their
religious beliefs under Islamic tenets, *see* Pl.'s Opp'n, ECF No.
21 at 7, and Mrs. Sabra is a practicing Muslim, Pl.'s SOMF, ECF
No. 21-2 at 6.

Mr. Sabra alleges that "[s]ignificant portions of the
unnecessary evidence requested by the Embassy, most notably a
DNA test and photos of [Mrs.] Sabra during pregnancy, conflict
with [Mr. and Mrs. Sabra's] already articulated sincerely held
religious beliefs." Compl., ECF No. 1 at 18 ¶ 78. Mr. Sabra

asserts that "[c]ontinued insistence on the provision of additional redundant evidence, requiring [Mr. and Mrs. Sabra] to choose between providing that evidence or adhering to their sincerely held religious beliefs, violates RFRA." *Id.* The Court notes that Plaintiff's counsel stated on the record that Mr. Sabra has a "strong religious hesitation" to DNA testing, whereas Mrs. Sabra has an "absolute religious objection" to the DNA testing of Baby M. Mot. Hr'g Rough Tr. (Aug. 16, 2019) at 104; *see also id.* at 7 (stating that Mrs. Sabra has "strong objections based on religion but also as to [Baby M's] safety"). With respect to the photographs, Plaintiff's counsel confirmed that there are two photographs of Mrs. Sabra during the pregnancy, but Mr. and Mrs. Sabra refuse to provide those photographs to the Embassy based on religious objections. *Id.* at 75. The basis for Mr. and Mrs. Sabra's objections is that the photographs are "very personal," they were "taken in an intimate in-house setting with just the family," and "for religious views, [they] should [not] be seen by anyone outside of the family ever." *Id.*

The Secretary does not address whether the Embassy's actions—requesting the submission of photographs showing Mrs. Sabra pregnant and DNA test results to prove the biological relationship—implicate Mr. and Mrs. Sabra's religious exercise. *See* Def.'s Mem., ECF No. 18-1 at 28-29. According to the

Secretary, "the State Department has applied the relevant regulation mandating that an applicant for a CRBA and passport prove their U.S. citizenship by a preponderance of the evidence—including, under the Department's interpretation, that a biological relationship exist between the U.S. citizen parent(s) and child-applicant." *Id*. at 29. Consistent with the State Department's interpretation, the Secretary argues that the Embassy "required [Mr. Sabra] to provide evidence of the parent-child relationship without any pressure on [Mr. and Mrs. Sabra's] to change their behavior in violation of their religion." *Id*. As such, Mr. Sabra, through counsel, asserted religious objections to any DNA testing and photographs of Mrs. Sabra to satisfy the State Department's biological relationship requirement. Pl.'s SOMF, ECF No. 21-2 at 5-6. The Court therefore finds that the Embassy's actions implicate Mr. and Mrs. Sabra's religious exercise.

## 2. Sincerely Held Religious Belief

As noted by the Supreme Court, "[t]o qualify for RFRA's protection, an asserted belief must be 'sincere.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014). The Supreme Court has emphasized that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S.

680, 699 (1989). And "[c]ourts generally handle 'the sincerity inquiry . . . with a light touch, or 'judicial shyness.'" *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 90 (quoting *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012)).

Here, Mr. Sabra argues—and the Secretary does not dispute— that his and Mrs. Sabra's religious views are sincere. *See, e.g.*, Pl.'s Opp'n, ECF No. 21 at 7; Def.'s Opp'n, ECF No. 28 at 23-24. Indeed, the Secretary points out that "[n]owhere in the RFRA section of the State Department's moving papers did it claim that [Mr. Sabra's] stated beliefs are not sincere." Def.'s Reply, ECF No. 29 at 10; *see also see* Def.'s Mem., ECF No. 18-1 at 27-28. Although the sincerity of Mr. and Mrs. Sabra's religious beliefs is unchallenged, Mr. Sabra argues that the Secretary "challenges whether [his] and [Mrs. Sabra's] expressed beliefs are in fact legitimate beliefs under Islamic tenets." Pl.'s Opp'n, ECF No. 21 at 7.

Mr. Sabra points to certain statements in the Secretary's submissions. *See, e.g.*, Woda Decl., ECF No. 18-3 at 3 ¶ 12 ("I understand that ACS Chief Greene suggested to the Sabras that a female officer would be available to review [Mrs.] Sabra's pregnancy photos"); *id*. at 4 ¶ 14 ("I have not previously heard of a Muslim applicant objecting to DNA testing on this basis"; "Officer [Darren] Sullivan stated that he has witnessed dozens

of DNA tests taken by Palestinian applicants, the majority of whom are Muslim, and has never seen an applicant articulate a religious objection"); Decl. of Darren Sullivan ("Sullivan Decl."), ECF No. 18-4 at 1 ¶ 2 ("I have witnessed almost 30 DNA tests taken by Israeli and Palestinian applicants of varied and diverse backgrounds"; "I have never seen an applicant articulate a religious objection to participating in DNA testing"); Def.'s SOMF, ECF No. 18-2 at 3 ("[Mrs.] Sabra . . . did not assert a religious objection" at the June 12, 2019 interview).

Mr. Sabra contends that "courts evaluating claims brought under the RFRA 'accept[] as true the factual allegations that [a plaintiff's] beliefs are sincere and of a religious nature.'" Pl.'s Opp'n, ECF No. 19 at 7 (quoting *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008)). But the D.C. Circuit in *Kaemmerling* considered the sufficiency of the complaint under Federal Rule of Civil Procedure 12(b)(6), conducted a *de novo* review, and accepted as true the factual allegations in the complaint. *See Kaemmerling*, 553 F.3d at 676-79; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face." (emphasis added) (citation and internal quotation marks omitted)). The legal standard for a Rule 12(b)(6) motion is inapplicable here. In evaluating a

party's motion for summary judgment, as here, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247).

Viewing the facts in the light most favorable to Mr. Sabra, Mr. and Mrs. Sabra's religious beliefs are sincere. Mr. Sabra avers that Mrs. Sabra "has in the past refused certain medical procedures based on her religious beliefs." M. Sabra Decl., ECF No. 21-1 at 1 ¶ 7; *see also* Pl.'s Ex. 1, ECF No. 21-1 at 7 (stating that "[REDACTED]"). Mr. Sabra asserts that "the only photos taken during [Mrs.] Sabra's pregnancy are intimate family photographs which, *for religious reasons*, the family is unwilling to provide as she is less than fully attired in these personal family moments." Compl., ECF No. 1 at 10 ¶ 43 (emphasis added). According to Mr. Sabra, the Embassy's request for DNA testing and the photographs conflicts with his and Mrs. Sabra's sincerely held religious beliefs. Compl., ECF No. 1 at 18 ¶ 78. In applying the "light touch" for the sincerity inquiry, *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 90, the Court therefore finds that Mr. Sabra has demonstrated a sincerely held belief that the Embassy's request for DNA testing and Mrs. Sabra's pregnancy photographs conflict with the religious exercise of Mr. and Mrs. Sabra.

### 3. Substantial Burden

The Court next considers whether Mr. Sabra demonstrates that the Embassy's actions placed a substantial burden on his and Mrs. Sabra's religious exercise. *See Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 88. "Whether a government action substantially burdens a plaintiff's religious exercise is a question of law for a court to decide." *Singh v. McHugh*, 185 F. Supp. 3d 201, 210 (D.D.C. 2016). "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). As the D.C. Circuit has explained, the "substantial burden" inquiry "prevent[s] RFRA claims from being reduced into questions of fact, proven by the credibility of the claimant." *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011).

The Secretary argues that "[Mr. Sabra] has failed to set forth a *prima facie* violation of RFRA as [Mr. Sabra] has not shown that any aspect of the Sabras' religious exercise has been substantially burdened by the Embassy's request for additional evidence, which could include, but was not limited to, the submission [of] photographs of [Mrs.] Sabra pregnant, and/or a DNA test." Def.'s Mem., ECF No. 18-1 at 28. The Secretary contends that "[t]he Embassy's decision applying the applicable

79

regulations was not contrary to law and does not violate RFRA."
*Id.* at 29. The Secretary maintains that Mr. Sabra could have
satisfied the State Department's biological relationship
requirement by complying with "the Embassy's request for
additional evidence, which could include photographs of [Mrs.]
Sabra while pregnant or a DNA test." Def.'s Reply, ECF No. 29 at
10.

To support his position, the Secretary relies on
*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008). *See* Def.'s
Mem., ECF No. 18-1 at 28. In *Kaemmerling*, the D.C. Circuit
concluded that the plaintiff—a federal prisoner—failed to
sufficiently allege a substantial burden under RFRA when he
sought to enjoin application of the DNA Analysis Backlog
Elimination Act based on his claim that the government's
sampling, storage, and collection of his DNA without limitations
violated his religious beliefs about the appropriate use of the
"building blocks of life." 553 F.3d at 679. There, the
plaintiff, an Evangelical Christian, objected on religious
grounds to the government collecting his DNA information. *Id.* at
673-74, 678-79. The plaintiff, however, did not object to the
collection of any particular DNA carrier, such as blood, saliva,
skin, or hair. *Id.* at 678. Neither did the plaintiff object to
the Federal Bureau of Prisons ("BOP") "sweeping up his hair
after a haircut or wiping up dust that contains particles of his

skin, even though those are acts of collecting bodily specimens containing DNA, if the BOP does not extract the DNA information contained in those specimens." *Id.*

The D.C. Circuit held that the plaintiff failed to "allege facts sufficient to state a substantial burden on his religious exercise because he [could not] identify any 'exercise' which [was] the subject of the burden to which he object[ed]." *Id.* at 679. Acknowledging that "the government's activities with his fluid or tissue sample after the BOP takes it may offend [the plaintiff's] religious beliefs," the D.C. Circuit rejected that the government had placed a substantial burden on the plaintiff because the plaintiff alleged "no religious observance that the DNA Act impede[d], or acts in violation of his religious beliefs that it pressure[d] him to perform." *Id.* at 679. The D.C. Circuit explained that the government did not substantially burden the plaintiff's religious exercise because "[t]he extraction and storage of DNA information are entirely activities of the [Federal Bureau of Investigation], in which [the plaintiff] plays no role and which occur after the BOP has taken his fluid or tissue sample (to which he does not object)." *Id.*

*Kaemmerling* is distinguishable from this case. Although the government's collection and storage of the plaintiff's DNA in *Kaemmerling* did not "pressure [him] to modify his own behavior

in any way that would [have] violate[d] his beliefs," *id.*, the
current record contains evidence that the Embassy's request for
DNA testing and photographs showing Mrs. Sabra pregnant would
"force[] [Mr. and Mrs. Sabra] to engage in conduct that their
religion forbids" or "prevent[] them from engaging in conduct
their religion requires," *Henderson*, 253 F.3d at 16. The Court
cannot find that the Embassy did not "condition[] receipt of an
important benefit upon conduct proscribed by [Mr. and Mrs.
Sabra's] religious faith, or . . . den[y] such a benefit because
of conduct mandated by [Mr. and Mrs. Sabra's] religious
belief," *Thomas,* 450 U.S. at 717–18. The CRBA and U.S. passport
are the governmental benefits here. *See id.*

In accordance with her religion, Mrs. Sabra declined
certain medical treatments, *see, e.g.*, Pl.'s Ex. 1, ECF No. 21-1
at 7; Compl., ECF No. 1 at 10 ¶ 43, and Mr. Sabra, along with
Mrs. Sabra, objected to DNA testing on religious grounds, Pl.'s
SOMF, ECF No. 21-2 at 6; *see also* M. Sabra Decl., ECF No. 21-1
at 1-2 ¶ 7 ("This is consistent with . . . my wife's expressed
belief that she wanted nothing invasive for religious
reasons."). Mrs. Sabra avers that Vice-Consul Woda "stated that
we would need to submit to a DNA test to prove [Baby M] is [her]
daughter" during the June 12, 2019 interview. P. Sabra Decl.,
ECF No. 52-2 at 7 ¶ 40; *see also* Woda Decl., 18-3 at 3 ¶ 13 ("I
suggested that [Mrs. Sabra] could also provide a DNA analysis

establishing a mother-child relationship, which could be the fastest and simplest method of resolving the issues."). According to Mrs. Sabra, DNA testing goes against her religious beliefs and she "knew it was not required and consider it a violation of [their] rights." P. Sabra Decl., ECF No. 52-2 at 7 ¶ 41. Although Mrs. Sabra admits that she did not object to the DNA testing during the interview, Mrs. Sabra avers that she "felt extremely hostile at that point," but that she "objected to the DNA generally, and also that it was risky to [Baby M's] health." Id. at 7 ¶ 42. There is no indication that Mrs. Sabra had legal representation at that point. Following the June 12, 2019 interview, Mr. and Mrs. Sabra, through counsel, asserted religious objections. Pl.'s SOMF, ECF No. 21-2 at 6.

With respect to Vice-Consul Woda's first declaration, Mr. Sabra argues that Vice-Consul Woda's averment—that "I understand that ACS Chief Greene suggested to the Sabras that a female officer would be available to review [the] pregnancy photos"—exceeds his personal knowledge. Pl.'s Reply, ECF No. 23 at 9 n.1 (quoting Woda Decl., ECF No. 18-3 at 3 ¶ 12). The Secretary responds that the Court may consider that statement because the "State Department would offer this evidence at trial through the direct testimony of Consular Chief Greene, who has personal knowledge of this offer, as she was the individual who communicated it to the Sabras." Def.'s Reply, ECF No. 29 at 13

n.2. The Secretary contends that he "must only demonstrate how that evidence would be offered in an admissible form at trial." *Id.* (citing Comm. Notes on 2010 Amendment to Fed. R. Civ. P. 56(c)(2)).

"A principal command of Rule 56[(c)(4)] is straightforward: 'Supporting and opposing affidavits' on summary-judgment motions 'shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (footnote omitted); *see also* Fed. R. Civ. P. 56(c)(4). And "[a]lthough the rule's directive with respect to the admissibility of an affidavit's contents on summary judgment has been liberally construed, its requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented. An affidavit based merely on information and belief is unacceptable." *Londrigan*, 670 F.2d at 1174 (footnotes omitted).

Here, the Secretary does not challenge the personal-knowledge requirement, and the Secretary concedes that Vice-Consul Woda's statement was not made on his personal knowledge. *See* Def.'s Reply, ECF No. 29 at 13 n.2. The Court will not consider Vice-Consul Woda's statement regarding the Embassy's offer to have a female officer view the photographs due to Vice-Consul Woda's lack of personal knowledge as to ACS Chief

Greene's statements. *See* Fed. R. Civ. P. 56(c)(4). For the same reason, the Court will not consider Mr. Sabra's statements in his declarations regarding Baby M's birth, Mrs. Sabra's meeting with Vice-Consul Woda, Dr. [REDACTED]'s actions, and Dr. [REDACTED]'s meeting with Mr. Sabra's brother. *See, e.g.*, M. Sabra Suppl. Decl., ECF No. 23-2 at 2 ¶¶ 9-11; M. Sabra Decl., ECF No. 21-1 at 2-4 ¶¶ 8-13; Def.'s Reply, ECF No. 29 at 13. It is undisputed that Mr. Sabra lives in California. *E.g.*, Pl.'s Reply to Def.'s Counterstatement to Pl.'s SOMF, ECF No. 23-1 at 1 ¶ 1; Def.'s Reply, ECF No. 29 at 13.

In determining whether the Embassy's request for the DNA analysis and photographs substantially burdened Mr. and Mrs. Sabra's exercise of religion, the Court disregards the statements contained within the declarations in support of the Secretary's motion for summary judgment regarding Mr. and Mrs. Sabra's religious objections to the DNA testing. *See* Woda Decl., ECF No. 18-3 at 4 ¶ 14 ("I have not previously heard of a Muslim applicant objecting to DNA testing on this basis"; "Officer Sullivan stated that he has witnessed dozens of DNA tests taken by Palestinian applicants, the majority of whom are Muslim, and has never seen an applicant articulate a religious objection"); Sullivan Decl., ECF No. 18-4 at 1 ¶ 2 ("I have witnessed almost 30 DNA tests taken by Israeli and Palestinian applicants of varied and diverse backgrounds"; "I have never seen an applicant

85

articulate a religious objection to participating in DNA testing"). As the Supreme Court has explained, "the judicial process is singularly ill equipped to resolve [intra-faith] differences" and "it is not within the judicial function and judicial competence to inquire whether [Mr. and Mrs. Sabra] or [other Muslim applicants] more correctly perceived the commands of their common faith." *Thomas*, 450 U.S. at 715-16.

While the State Department's guidance states that DNA "[t]esting is to verify a relationship is entirely voluntary," Def.'s Ex. 3, ECF No. 18-3 at 32, the Secretary contends that DNA testing may be required "[i]n a case where the biological relationship between a U.S. citizen and their claimed child is at issue," Def.'s Opp'n, ECF No. 28 at 22 (citing *Parham v. Clinton*, Civ. A. No. 09-1105, 2009 WL 2870671, at * 9 (S.D. Tex. Aug. 31, 2009)). Here, there is no question that the Embassy requested the photographs of Mrs. Sabra while pregnant and DNA analysis to adjudicate the CRBA and passport applications. *See, e.g.*, Def.'s Reply, ECF No. 29 at 10; Pl.'s SOMF, ECF No. 21-2 at 4-5. The Court therefore finds that the Embassy's request for the submission of DNA testing and photographs to meet the State Department's biological relationship requirement constitutes a "substantial burden" under RFRA.

Applying the burden-shifting analysis, the Secretary must demonstrate that the Embassy's request of the DNA testing and

photographs furthers a compelling governmental interest by the least restrictive means. *See Singh*, 185 F. Supp. 3d at 217. The Secretary, however, does not address this burden. *See* Def.'s Mem., ECF No. 18-1 at 28-29. Rather, the Secretary focuses on Mr. Sabra's initial burden to establish a *prima facie* violation under RFRA. *See id.* The Court cannot grant summary judgment to the Secretary on Mr. Sabra's RFRA claim because the Secretary has failed to present evidence that the governmental interest is compelling or if the Embassy's actions were the least restrictive means. There is a genuine dispute as to whether the Embassy's request for the DNA testing and Mrs. Sabra's pregnancy photographs served a compelling interest by the least restrictive means. Accordingly, the Court **DENIES** the Secretary's motion for summary judgment as to Count IV.

## V. Conclusion

For the reasons set forth above, the Court **DENIES** Mr. Sabra's Motion for Summary Judgment as to Counts I-III, **GRANTS** the Secretary's Motion for Summary Judgment as to Counts I-III, and **DENIES** the Secretary's Motion for Summary Judgment as to Count IV. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED**

**Signed:** **Emmet G. Sullivan**
**United States District Judge**
**March 9, 2020**