UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED SABRA, as next friend of
Baby M.,

Plaintiff,

v.                                          Civil Action No. 19-2090 (EGS)

MICHAEL POMPEO, in his official capacity
as Secretary of the United States Department
of State,

Defendant.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S COMBINED [1] MOTION TO DISMISS IN PART PLAINTIFF'S AMENDED COMPLAINT, [2] MOTION FOR RECONSIDERATION, AND [3] RENEWED MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

*Table of Authorities*…………………………………………………………………………iii

INTRODUCTION……………………………………………………………………...1

BACKGROUND………………………………………………………………………….3

    A.    Statutory Framework……………………………………………………...3

    B.    The Department's Denial of Baby M.'s ACBA and Passport Applications…………………………………………………………………5

LEGAL STANDARDS……………………………………………………………….15

    A.    Dismissal Pursuant to Rule 12(b)(6)……………………………………….15

    B.    Reconsideration Pursuant to Rule 54(b)……………………………………15

    C.    Summary Judgment Pursuant to Rule 56………………………………...16

ARGUMENT……………………………………………………………………….17

I.    Plaintiff's APA Claim Should be Dismissed for Failure to State a Claim………………...17

    A.    Plaintiff's APA claim is barred because the INA provides an adequate alternate remedy……………………………………………………………17

    B.    The Court's prior ruling is inconsistent with a finding that the Department of State acted arbitrarily and capriciously in denying Baby M.'s Consular Report and passport applications…………………………………………...23

II.    The Court Should Reconsider its Determination that Plaintiff Met His Initial Burden on his RFRA Claim Because the Department's Conduct Did Not Impose a Substantial Burden on Plaintiff's Religious Exercise…………………………………26

III.    Defendant is Entitled to Summary Judgment on Plaintiff's RFRA Claim Because the Department's Request for Additional Evidence Furthered Compelling Government Interests and Did so Through the Least Restrictive Means…….28

    A.    The Department's CRBA and passport application processes serve compelling governmental interests……………………………………………29

    B.    The Department's request for additional evidence was the least restrictive means of accomplishing its compelling interests in this case……………………..34

CONCLUSION…………………………………………………………………………..37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ali v. Carnegie Inst. of Wash.*,
   309 F.R.D. 77 (D.D.C. 2015)........................................................................16, 26

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................16, 17

*Atherton v. D.C. Office of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009)..........................................................................15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................15

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)..........................................................................................18

*Bryant v. Gomez*,
   46 F.3d 948 (9th Cir. 1995)..............................................................................28

*Califano v. Sanders*,
   430 U.S. 99 (1977)............................................................................................23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................................16, 17

*Chacoty v. Pompeo*,
   392 F. Supp. 3d 1 (D.D.C. 2019)................................................................20, 22

*Citizens for Responsibility & Ethics in Wash. ("CREW") v. Dep't of Justice*,
   846 F.3d 1235 (D.C. Cir. 2017)..................................................................18, 20

*Cobell v. Norton*,
   224 F.R.D. 266 (D.D.C. 2004)....................................................................15, 16

*Conley v. Gibson*,
   355 U.S. 41 (1957)............................................................................................15

*Czekalski v. Peters*,
   475 F.3d 360 (D.C. Cir. 2007)..........................................................................17

*Dep't of Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999)..........................................................................................23

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health & Human Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005)........................................................................18

*Flores v. Pompeo*,
   936 F.3d 273 (5th Cir. 2019) ............................................................................19

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005)............................................................................23

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009)....................................................................18, 20

*Gonzalez Boisson v. Pompeo*, Civ. A. No. 19-2105 (JDB),
   2020 WL 20438889 (D.D.C. Apr. 28, 2020) ...................................................20

*Greene v. Dalton*,
   164 F.3d 671 (D.C. Cir. 1999)..........................................................................17

*Hassan v. Holder,*
    793 F. Supp. 2d 440 (D.D.C. 2011) ........................................................ 19
*Henderson v. Kennedy,*
    253 F.3d 12 (D.C. Cir. 2001) ................................................................. 28
*Hinojosa v. Horn,*
    896 F.3d 305 (5th Cir. 2018) ............................................................. 19, 20
*Jones v. Williams,*
    791 F.3d 1023 (9th Cir. 2015) ............................................................... 28
*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ............................................................... 27
*LaShawn A. v. Barry,*
    87 F.3d 1389 (D.C. Cir. 1996) ............................................................... 25
*Lewis v. District of Columbia,*
    736 F. Supp. 2d 98 (D.D.C. 2010) ......................................................... 16
*Lucas v. District of Columbia,*
    214 F. Supp. 3d 1 (D.D.C. 2016) ........................................................... 16
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................ 17
*Miller v. Albright,*
    523 U.S. 420 (1998) .............................................................................. 3, 4
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, (1983) ................................................................................ 24
*Murphy v. Exec. Off. for U.S. Attorneys,*
    11 F. Supp. 3d 7 (D.D.C. 2014) ........................................................ 15, 16
*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004) ............................................................... 23
*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ............................................................... 18
*Rusk v. Cort,*
    369 U.S. 367 (1962) ................................................................... 20, 21, 22
*Sample v. Lappin,*
    424 F. Supp. 2d 187 (D.D.C. 2006) ....................................................... 29
*Transohio Sav. Bank v. Dir., Office of Thrift Supervision,*
    967 F.2d 598 (D.C. Cir. 1992) ............................................................... 23
*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) .................................................................................. 3
*Weir v. Nix,*
    114 F.3d 817 (8th Cir. 1997) ................................................................. 28
*Wisconsin v. Yoder,*
    406 U.S. 205, (1972) .............................................................................. 29
*Xia v. Tillerson,*
    865 F.3d 643 (D.C. Cir. 2017) ........................................................ passim

## Statutes

5 U.S.C. § 701 .............................................................................................. 1
5 U.S.C. § 702 ............................................................................................ 18

5 U.S.C. § 704 ........................................................................................................ 18, 22, 23

5 U.S.C. § 706 .................................................................................................................. 18

5 U.S.C. § 706(2)(A) ........................................................................................................ 24

8 U.S.C. § 1104(a) .............................................................................................................. 4

8 U.S.C. § 1401(c) .............................................................................................................. 3

8 U.S.C. § 1401(g) .............................................................................................................. 3

8 U.S.C. § 1503 .............................................................................................................. 4, 17

8 U.S.C. § 1503(a) .............................................................................................................. 5

8 U.S.C. § 1503(b) .................................................................................................. 5, 19, 22

8 U.S.C. § 1503(c) .................................................................................................... 5, 19

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 15

Fed. R. Civ. P. 54(b) ........................................................................................................ 15

Fed. R. Civ. P. 56 ........................................................................................................ 16, 17

**Regulations**

22 C.F.R. Part 51 ................................................................................................................ 4

22 C.F.R. § 50.1(d) (2009) ................................................................................................. 4

22 C.F.R. § 50.11 ................................................................................................................ 5

22 C.F.R. § 50.2 .................................................................................................................. 4

22 C.F.R. § 51.28 ................................................................................................................ 7

**INTRODUCTION**

Plaintiff Mohammed Sabra, on behalf of his infant daughter, Baby M., seeks an order declaring that Baby M. is the biological child of U.S. citizens Mr. and Ms. Sabra, and thus eligible for United States citizenship and entitled to the rights and privileges of U.S. citizenship by birth. But this Court has already determined that Mr. Sabra "has failed to provide satisfactory proof of Baby M.'s birth, identity, and citizenship to establish her entitlement to a [Consular Report of Birth Abroad] and passport under the applicable statutes and regulations." ECF No. 59 ("Mem. Op.") at 30.

Now, Plaintiff has amended his complaint to seek, for the first time, relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, arguing that Defendant's denials of Plaintiff's applications for a Consular Report of Birth Abroad ("CRBA") and passport for Baby M. were arbitrary and capricious. This claim should not advance past the pleading stage for two reasons.

First, Plaintiff fails to state a claim upon which relief may be granted because the Immigration and Nationality Act ("INA") provides an adequate other remedy in the form of specific procedures—culminating in judicial review—for Baby M. to try to establish her citizenship. Because there exists an adequate, alternative remedy to the relief sought through the APA, Plaintiff may not proceed under the APA, and must challenge the Department of State's decisions under the appropriate review provision of the INA.

Second, the Court has already determined that the record before the Embassy and the Court contained numerous "inconsistencies that support the Embassy's final decision that Mr. and Mrs. Sabra's submissions are insufficient proof of Baby M.'s birth, identity, and citizenship," Mem. Op. at 68-71, and that "Mr. Sabra has failed to provide sufficient documentation as proof of Baby M.'s birth, identity and citizenship, as required by the applicable statutes and regulations." Mem.

Op. at 70.  Plaintiff has not moved for reconsideration of the Court's ruling, and yet now seeks essentially to relitigate this same issue, under a standard (arbitrary and capricious review) that is even more deferential to the government.  The Court's earlier ruling would be wholly inconsistent with a finding that Defendant's denials of the CRBA and passport applications were arbitrary and capricious.  The Court should therefore adopt its prior reasoning and, in the interest of judicial economy, should dismiss Plaintiff's APA claim for failure to state a claim or, in the alternative, grant summary judgment to Defendant based on the record already before the Court on the parties' first cross motions for summary judgment in this case.

Plaintiff also claims that the State Department's failure to issue a passport and CRBA constitutes a violation of Plaintiff's rights to free exercise of religion under the Religious Freedom Restoration Act ("RFRA").  The Court has previously found that Plaintiff met his initial burden to establish a *prima facie* violation under RFRA.  Mem. Op. at 71-86.  Defendant, however, respectfully moves for reconsideration of this decision.  As a matter of law, Defendant's request that Plaintiff provide additional evidence in support of Baby M.'s identity and the Sabra's relationship to Baby M—which could include, but was not *required* to include, photos of Ms. Sabra pregnant or a DNA test—did not place a substantial burden on Plaintiff's religious exercise.

In the alternative, even if the Court denies Defendant's request for reconsideration and maintains its finding that the Department has imposed a substantial burden on Plaintiff's religion, Defendant is still entitled to summary judgment in its favor regarding Plaintiff's RFRA claim.  The Department's CRBA and passport application processes serve compelling governmental interests in: (1) ensuring that U.S. citizenship documentation is obtained only by those entitled to it, and (2) defending against international child abduction, illegal adoption, and child trafficking efforts. The Department's processes are the least restrictive means of accomplishing those interests—it

requested any evidence that the Sabra's could provide to establish their relationship with Baby M. Indeed, there is no less restrictive means possible.

In support of this motion, Defendant provides the attached declaration of Paul Peek, Director of the Office of Adjudication within the Passport Services Directorate of the U.S. Department of State's Bureau of Consular Affairs.

## BACKGROUND

### A.    Statutory Framework.

There are "two sources of [United States] citizenship, and two only: birth and naturalization." *United States v. Wong Kim Ark,* 169 U.S. 649, 702 (1898). The Fourteenth Amendment to the United States Constitution declares that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV.   Thus, persons who are born in the United States acquire citizenship by birth automatically.   Persons born outside of the United States, however, acquire citizenship by birth only as provided by Acts of Congress. *Wong Kim Ark,* 169 U.S. at 703; *see also Miller v. Albright,* 523 U.S. 420, 424 (1998).

By statute, a person who is born abroad to married parents automatically becomes a national and citizen of the United States if both parents are United States citizens and at least one of the parents has had a residence in the United States or one of its outlying possessions prior to the birth of such person. 8 U.S.C. § 1401(c).   If one parent is not a United States citizen, however, a person who is born abroad may still acquire United States citizenship if the other parent is a United States citizen who has been physically present within the United States for a sufficient length of time prior to the birth.   *See* 8 U.S.C. § 1401(g).   Congress has delegated the responsibility for administering and enforcing the law relating to nationality to the Secretary of State, whose authority extends to "the determination of nationality of a person not in the United States."   8

U.S.C. § 1104(a).  A person's "nationality" in this context is defined to mean citizenship.  *See* 22 C.F.R. § 50.1(d) (2009) (defining "national" to mean "a citizen of the United States or a noncitizen owing permanent allegiance to the United States").  Thus, the State Department is charged with determining claims to United States citizenship of persons abroad when made through an application for a CRBA or a passport.  *See id.* at § 50.2.

Claims to United States citizenship for persons born abroad are made through an application for registration or a passport or through an application for a CRBA. 22 C.F.R. § 50.2.  Determinations of citizenship may be made abroad by a consular officer or a designated nationality examiner who may approve or disapprove an application for registration or for a passport.  *Id.*  A CRBA may only be issued by a consular officer, depending on whether a nationality examiner has given provisional approval, and such report will issue only if the consular officer is "satisfied that the claim to nationality has been established."  *Id.*  The applicant seeking a CRBA must submit proof of the child's birth, identity, and citizenship in compliance with the requirements set forth in the regulations governing passports.  *See id.* at § 50.5 (referencing 22 C.F.R. Part 51, Subpart C).  Under this section, the applicant has the burden of proving that he or she is a United States citizen.  *See id.* at § 51.40.  The applicant must provide documentary evidence in support of a claim that he or she is a United States citizen.  *Id.* at § 51.41.  A consular official "may issue" a CRBA only upon application and the submission of "satisfactory proof of birth, identity and nationality[.]"  *Id.* at § 50.7(a).

Section 360(a) of the INA outlines the process by which individuals can receive judicial review of the denial of "a right or privilege as a national of the United States" by a government official, department, or independent agency, "upon the ground that he is not a national of the United States."  8 U.S.C. § 1503; *see also Xia v. Tillerson*, 865 F.3d 643, 655 (D.C. Cir. 2017)

("Section 1503 provides for judicial review of denial of any 'right or privilege' of citizenship, including invalidations of passports or naturalization certificates.").  An aggrieved party seeking to take advantage of Section 1503 must take one of two paths.  If she is "within the United States," Section 1503(a) creates a cause of action allowing her to seek a declaration in court that she is "a national of the United States." 8 U.S.C. § 1503(a).  Where, as here, the aggrieved party is "not within the United States," however, her starting point is Section 1503(b), which permits an aggrieved party to apply for a "certificate of identity" from the U.S. diplomatic or consular officer in the country in which she resides.  8 U.S.C. § 1503(b); *see also* 22 C.F.R. § 50.11.

        If the Department grants the individual's application for a certificate of identity, she may then apply for admission to the United States at a port of entry, subject to "all the provisions . . . relating to the conduct of proceedings involving aliens seeking admissions to the United States." 8 U.S.C. § 1503(c).  If she is admitted to the United States, she will then be "within the United States" and may make a claim for citizenship pursuant to Section 1503(a). If she is not admitted into the United States, she may seek a "final determination by the Attorney General" that is "subject to review by any court of competent jurisdiction in habeas corpus proceedings and not otherwise." *Id.*  Similarly, if the Department denies her application for a certificate of identity, she can appeal that decision to the Secretary of State, 8 U.S.C. § 1503(b), and if the Secretary affirms that denial and no other remedy is available, she may then seek review of that determination in district court under the APA.

**B.      The Department's Denial of Baby M.'s CRBA and Passport Applications.**

        On June 11, 2019, U.S. citizen Ponn Sabra ("Ms. Sabra") telephoned the U.S. Embassy in Jerusalem from Gaza and requested an emergency appointment to apply for a CRBA and U.S. passport for an infant, Baby M., purportedly born in Gaza on ███ 2019.  ECF No. 18-3, Declaration of Joshua Woda, Vice-Consul U.S. Embassy Jerusalem (August 6, 2019) (Sealed)

("Woda Decl.") ¶ 6. Ms. Sabra claimed to be Baby M.'s biological mother and stated that the child had serious health issues and required the requested passport to return to the United States for medical treatment. Woda Decl. ¶ 7. Ms. Sabra also stated that she was 46 years old at the time of the child's birth. Woda Decl. ¶ 7.

Because 46 is an advanced age for the mother of a newborn, the Embassy—following its routine practice and Department policy—asked Ms. Sabra whether she had documentary evidence, such as prenatal medical records, to establish the child's identity and Ms. Sabra's claimed biological relationship to the child. Woda Decl. ¶ 7. Ms. Sabra stated that she had no such records as she did not receive any prenatal medical care. Woda Decl. ¶ 7. Because the Embassy was already scheduled to visit the Erez border crossing between Gaza and Israel the next day, June 12, 2019, the Embassy agreed to accept the Sabras' application in person on that date. Woda Decl. ¶ 7.[1]

On June 12, 2019, Joshua Woda, Vice-Consul for U.S. Embassy Jerusalem, met Ms. Sabra at the Erez border crossing to accept Ponn and Mohammad Sabra's passport and CRBA application for Baby M. and to perform an interview of Ms. Sabra. Woda Decl. ¶ 8. Along with the application, Ms. Sabra provided Vice-Consul Woda with: (1) a birth certificate for Baby M. , issued by the Palestinian Authority on June 10, 2019; (2) copies of U.S. passports for Ponn and

---

[1]    Since 2007, Gaza has been under the *de facto* control of Hamas, a U.S. government-designated Foreign Terrorist Organization ("FTO"). Woda Decl. ¶ 4. U.S. government employees are prohibited from entering Gaza for personal or official purposes. *Id*. In addition, the State Department has a long-standing Travel Advisory urging all U.S. citizens not to travel to Gaza. *Id*. The State Department has extremely limited resources to assist U.S. citizens and confirm the authenticity of documents issued by the local authorities in Gaza. *Id*. U.S. citizens residing in Gaza are unable to travel to Jerusalem to apply for services without a permit issued by the Israeli authorities. *Id*. Accordingly, a team from the American Citizens' Services unit at U.S. Embassy Jerusalem travels to the Erez border crossing between Gaza and Israel once every six months to provide services to U.S. citizens, including taking passport and citizenship applications. *Id*.

Mohammad Sabra; (3) a copy of the Sabras' marriage certificate; (4) a pediatric admission form dated June 9, 2019; and (5) a photocopy of a Power of Attorney, dated March 6, 2015, from Mohammad Sabra to Ponn Sabra.   Woda Decl. ¶ 8, Ex. 2; *see also* ECF No. No. 28-2, Supplemental Declaration of Joshua Woda (Aug. 13, 2019) ("Supp. Woda Decl.") Ex. 6.

The child, Baby M., was not present with Ms. Sabra during the June 12, 2019, interview at the Erez border crossing.  Woda Decl. ¶ 9.  U.S. regulations require that a child be present for an interview absent emergency circumstances, 22 C.F.R. § 51.28, and Ms. Sabra stated that Baby M. could not appear for the interview because she was still hospitalized.  Woda Decl. ¶ 9.  As evidence of the child's medical condition, Ms. Sabra presented Vice-Consul Woda with a single sheet of paper, consisting of a one sentence statement, in English, that the child had a respiratory condition. Woda Decl. ¶ 9.

From Vice-Consul Woda's interview with Ms. Sabra and review of the documents she submitted in connection with the Sabras' application for a CRBA and passport for Baby M., Vice-Consul Woda determined that Ms. Sabra was born in ▓▓▓▓▓▓[2] and was 46 years old when Baby M. was born on ▓▓▓, 2019.  Woda Decl. ¶ 10.  Ms. Sabra's other three children were born in 2000, 2001, and 2003.  Woda Decl. ¶ 10.

Vice-Consul Woda also observed that a record of birth submitted by Ms. Sabra, which was, unusually, issued about a month after her birth on June 10, 2019, appeared to be altered.  Woda Decl. ¶ 10.  The document was mostly machine printed, but the place of birth was covered with whiteout and the words "private clinic," in Arabic, were handwritten over the whiteout.  Woda Decl. ¶ 10.  Vice-Consul Woda was unable to read what was written under the whiteout. Woda

---

[2]     Vice-Consul Woda mistakenly recorded Mr. Sabra's date of birth, ▓▓▓▓▓▓, in his case notes as Ms. Sabra's date of birth, but notes Ms. Sabra's correct date of birth, ▓▓▓▓▓, in his declaration submitted in support of the government's first motion for summary judgment.

Decl. ¶ 10.  This document is not a record of the child or mother's "discharge" from a hospital.
Woda Decl. ¶ 10.

Ms. Sabra did not provide any medical documentation of pre or post-natal care, stated that
she did not receive any such care, and failed to provide any documentation supporting her
contention that she was pregnant and recently gave birth.  Woda Decl. ¶ 10.  She also provided no
documentation supporting her claim that Baby M. required immediate issuance of a U.S. passport.
Woda Decl. ¶ 10.  Ms. Sabra could not explain how the child would be able to take a transatlantic
flight to the United States—which would first require overland travel to Amman, Jordan; Cairo,
Egypt; or Tel Aviv, Israel—when she was not well enough to appear for the interview at the Erez
crossing.  Woda Decl. ¶ 10.

From Vice-Consul Woda's training and experience, his review of the documentation
submitted, and his interview of Ms. Sabra, he identified several factors that caused him to doubt
whether the claimed biological relationship between Ms. Sabra and Baby M. existed.  Woda Decl.
¶ 11.  Because pre- and post-natal medical care in Gaza is widely available, Vice-Consul Woda
found it suspicious that Ms. Sabra could provide no evidence of any such care.  Woda Decl. ¶ 10.
Additionally, Vice-Consul Woda found it unusual that Baby M.'s birth certificate stated that she
was born in a private clinic, because almost all children in Gaza are born in hospitals.  Woda Decl.
¶ 10.  Finally, Vice-Consul Woda found it unusual that, although Ms. Sabra requested emergency
issuance of a passport while citing a need for emergency medical treatment in the United States,
she presented essentially no evidence of the claimed urgent medical needs and appeared to have
no plan for the child's travel and treatment.  Woda Decl. ¶ 10.

At the conclusion of Vice-Consul Woda's interview with Ms. Sabra, he informed her that
he was unable to approve the application without additional evidence of her claimed biological

relationship to Baby M.  Woda Decl. ¶ 12.  He explained to Ms. Sabra that such evidence could include, but was not limited to, among other things, pre- and post-natal medical records, ultrasounds, and/or photographs of Ms. Sabra during her pregnancy.  Woda Decl. ¶ 12.  Vice-Consul Woda requested this additional evidence because he determined that the Sabras had not met their burden of proof based on Ms. Sabra's responses during her interview and the documents provided, all of which raised concerns that Ms. Sabra was not Baby M.'s biological mother, as she claimed to be.  Woda Decl. ¶ 12.

Ms. Sabra informed Vice-Consul Woda that she did not have, or would not produce, the additional evidence requested.  Woda Decl. ¶ 13.  Vice-Consul Woda then suggested that she could consider providing a DNA analysis establishing a mother-child relationship.  Woda Decl. ¶ 13.  Ms. Sabra objected to the processing time that DNA testing could take but did not raise any religious objections.  Woda Decl. ¶ 14.

Vice-Consul Woda also advised Ms. Sabra that the photocopied power of attorney document signed by Mohammed Sabra four years earlier in 2015 was insufficient to meet the requirement that both parents consent to issuance of a passport to a minor.  Woda Decl. ¶ 13.

On June 21, 2019, Mohammad Sabra emailed the Embassy copies of documents purporting to show that Ms. Sabra received ███████████ in the United States from February to May 2018.  Woda Decl. ¶ 15; Compl. Exhibits B, G.  Vice-Consul Woda reviewed these materials and determined that, even if they were genuine and credible medical records, they did not demonstrate that Ms. Sabra had been pregnant and given birth to Baby M. because they were dated at least 12 months before Baby M.'s birth.  Woda Decl. ¶ 15.  Vice-Consul Woda responded to the Sabras' email the same day, again suggesting that the family submit pre- and post-natal medical records, ultrasounds, photographs of Ms. Sabra during the pregnancy, or any other evidence that could

substantiate the claimed biological relationship—the parental relationship that Ms. Sabra claimed to have with Baby M.[3]  Woda Decl. ¶ 15.   Vice-Consul Woda reiterated that DNA testing was a viable alternative for resolving the application.  Woda Decl. ¶ 15.

On June 25, 2019, after several unsuccessful attempts to reach Ms. Sabra by phone, the Embassy emailed the Sabras and offered to assist in obtaining a permit from the Israeli authorities so that Baby M. could be transferred to the nearest qualified hospital in Israel for any urgent medical treatment.  Woda Decl. ¶ 16; Compl. Exhibit G.  The Sabras never accepted this offer despite the purportedly urgent medical condition of Baby M.  Woda Decl. ¶ 16.

Also on June 25, 2019, the Embassy received a statement from legal counsel for the Sabras, threatening litigation and demanding immediate issuance of a passport to Baby M.  Woda Decl. ¶ 17.  The statement did not include any new evidence.  *Id.*  The Embassy responded to the Sabra's legal counsel on June 28, 2019, again requesting evidence supporting the application and reiterating the Embassy's offer to assist in obtaining a permit from the Israeli authorities.  Woda Decl. ¶ 17; Compl. Exhibit H.

On June 28, 2019, counsel for the Sabras emailed the Embassy a declaration from a Dr. ███████████ from Al Shifa hospital in Gaza regarding Baby M.'s medical condition.  Woda Decl. ¶ 18; Compl. Exhibit A.  The declaration, dated June 25, 2019, was written in technical, legalistic English and referenced portions of the U.S. Code.  Woda Decl. ¶ 18.   The declaration did not contain any indication that it was originally written in Arabic or that the declarant had it translated for him.  Woda Decl. ¶ 18.

---

[3]      Whether a biological parental relationship is always required to establish parentage under the statute at issue is not germane to this action.  Ms. Sabra claims she is the biological mother of Baby M., not that she enjoys some other non-biological form of parentage.  As such, Ms. Sabra's status as Baby M.'s parent rises and falls with her biological relationship to Baby M. as that is the relationship she claims to have with her.

On July 1, 2019, Vice-Consul Woda called Al Shifa hospital in Gaza to verify the information in Dr. ███████'s declaration, to discuss the circumstances of Baby M.'s birth, and to discuss Baby M.'s medical condition.  Woda Decl. ¶ 19.   Because counsel for the Sabras did not provide contact information for Dr. ███████, Vice-Consul Woda located a phone number for Al Shifa hospital via an internet search, and the hospital provided Vice-Consul Woda with Dr. ███████'s personal phone number.  Woda Decl. ¶ 19.

That same day, Vice-Consul Woda called Dr. ███████.  Woda Decl. ¶ 20.   Also participating in the call was a locally employed Embassy staff supervisor, Majed Rizek, who is a native speaker of the Palestinian/Levantine dialect.  Woda Decl. ¶ 20.   Although Vice-Consul Woda is fully professionally proficient in Arabic (including the Leventine/Palestinian dialect), he requested Majed Rizek's participation because the conversation was likely to include medical and other technical vocabulary.  Woda Decl. ¶ 20.   At the beginning of the call, Dr. ███████, stated, in Arabic, that he did not speak English.  Woda Decl. ¶ 20.   For clarity, Vice-Consul Woda proceeded to ask questions in English, which Mr. Rizek translated into Arabic.  Woda Decl. ¶ 20.   For consistency, Mr. Rizek also translated Dr. ███████'s responses to English, although Vice-Consul Woda also understood the Arabic responses.  Woda Decl. ¶ 20.

During the July 1, 2019, call, Dr. ███████ stated that he is a neighbor of Ms. Sabra in Gaza.  Woda Decl. ¶ 21.   He recounted that he received a call asking him to come to Ms. Sabra's home as she was in labor and in need of assistance.  Woda Decl. ¶ 21.   He stated that he arrived at Ms. Sabra's home after the child had been born and advised that the child be taken to Al Shifa hospital for care.  Woda Decl. ¶ 21.   Vice-Consul Woda asked Dr. ███████ to repeat his understanding of where Baby M. was born, and he again stated that he believed she was born at Ms. Sabra's home, but that he did not witness her birth.  Woda Decl. ¶ 21.   Vice-Consul Woda

found this response noteworthy, as it contradicted Ms. Sabra's repeated statements and documentation claiming that Baby M. was born in a private medical clinic.  Woda Decl. ¶ 21.

Vice-Consul Woda asked Dr. ████████ about Baby M.'s medical care and her current prognosis.  Woda Decl. ¶ 22.  Dr. ███████ stated that he is not involved with Baby M.'s medical care, that he had not seen her or Ms. Sabra since the day he was called to her home, and that he could not comment on Baby M.'s current medical condition.  Woda Decl. ¶ 22.   Aside from prescribing antibiotics, he did not provide any pre- or post-natal care to Ms. Sabra.  Woda Decl. ¶ 22.  He further stated that he did not believe that Baby M. was receiving in-patient medical care at Al Shifa hospital and that he did not have any medical records for Baby M.  Woda Decl. ¶ 22. This information flatly contradicted the contents of the English-language declaration submitted by Plaintiff's counsel and allegedly signed by Dr. ██████ .  *See* Compl. Exhibit A.  Vice-Consul Woda thanked Dr. ███████ for speaking with the Embassy and asked that Dr. ███████ contact the Embassy if he had any additional information to share of if he needed assistance regarding Baby M.  Woda Decl. ¶ 23.   Dr. ███████ never contacted the Embassy.  Woda Decl. ¶ 23.

From his conversation with Dr. ███████, Vice-Consul Woda determined that the declaration provided by counsel for the Sabras was not credible.  Woda Decl. ¶ 24.   Rather than resolving questions about the circumstances of Baby M.'s birth and her medical condition, the declaration and interview of Dr. ███████ raised additional concerns regarding the veracity of the statements made in the Sabras' application.  Woda Decl. ¶ 24.

On July 15, 2019—before the Embassy had made a final decision with respect to Baby M.'s CRBA and passport applications—Plaintiff filed the instant lawsuit seeking declaratory, injunctive, and mandamus relief.  ECF. No. 1, Compl.  Two and a half weeks later, on August 1, 2019, Plaintiff filed an Emergency Motion to Expedite Consideration of the Complaint for

Declaratory, Injunctive, and Mandamus Relief.  ECF. No. 12.  The parties agreed to an expedited summary judgment briefing schedule.  ECF. No. 14.

During this litigation, and while the Sabras' applications were still pending a final decision, the Sabras submitted declarations from several family members and a statement of consent regarding issuance of a passport to a minor signed by Mr. Sabra.  *See* Am. Compl. Exs. H-J; ECF No. 51 ¶ 2.  The consular officer evaluated all submitted documents.  *See* Declaration of Paul Peek (Aug. 17, 2020) ("Peek Decl.") ¶ 26 ("The adjudicating officer reviewed and considered each document submitted in support of Baby M.'s application.").

The Sabras never provided medical documentation to substantiate their claim that an emergency medical situation existed such that Baby M.'s in person appearance should be waived. *See* Mem. Op. at 63 ("The Court cannot ignore that Mr. Sabra has failed to provide critical information, specifically Baby M.'s written medical records to substantiate Baby M.'s birth and health condition.")  The Sabras declined Defendant's offer to coordinate a third party medical examination.  *Id.* ("Mr. and Mrs. Sabra declined the State Department's invitation to enlist the services of the medical doctor practicing in Gaza who has previously contracted with the Embassy to perform a medical examination and issue a written report.")  The Sabras also declined an opportunity to present Baby M. for an in person appearance at the Erez Crossing in November 2019, once the claimed medical emergency had allegedly resolved.  ECF No. 51 ¶ 5.

Also during the litigation, Defendant clarified that DNA testing could be performed on either Mr. Sabra or Ms. Sabra.  *See* 9/4/2019 Hearing Tr. at 22 ("Where there are two United States citizens who are claiming to be the biological parents of a child, either citizen parent can confer citizenship to a child born overseas.  So, it is not only Ms. Sabra's DNA which could be used to compare against the child, but also Mr. Sabra's.  I know plaintiff has represented that Ms. Sabra

was absolutely unwilling to do DNA testing, and Mr. Sabra was hesitant, I believe is the word that plaintiff's counsel had used."). Defendant also offered for a female consular officer to review Ms. Sabra's pregnancy photos, if there was a religious objection to have such photos reviewed by a male consular officer. *See* 8/16/2019 Hearing Tr. at 54-55 ("one of the items of evidence that the State Department suggested could be provided were photos of Mrs. Sabra while pregnant . . . plaintiff has stated that there are such photos, but that she does not want to provide them, and that that was a religious objection to providing those photos. The embassy is willing to have a female consular officer review those photos."). The Sabras ultimately chose not to submit DNA testing, pregnancy photographs, or any further materials in support of Baby M.'s applications. *See generally* Am. Compl.

After reviewing Mr. and Ms. Sabra's submissions and the filings in this case in support of the CRBA and passport applications, the Embassy made its final decision on October 22, 2019. *See* Final Decision, ECF No. 55-1 at 2. The Embassy determined that Mr. Sabra failed to present satisfactory proof of Baby M.'s birth, identity, and citizenship. *See id.*

Approximately five months after the Embassy's final decision, the Court issued its ruling on the parties' cross motions for summary judgment. *See generally* Mem. Op. The Court denied Plaintiffs' motion in its entirety and granted Defendants motion with respect to all but Plaintiff's RFRA claim. *Id.*

On June 26, 2019, Plaintiff amended his complaint to include a claim that Defendant's final agency action was arbitrary and capricious in violation of the APA. *See* ECF No. 66, ("Am. Compl.") at Count 3. Defendant now moves for the dismissal of Plaintiff's APA claim and reconsideration of the Court's earlier decision that Plaintiff had met his initial burden with respect

to his RFRA claim.  Defendant also renews his motion for summary judgment on Plaintiff's RFRA

claim.

## LEGAL STANDARDS

### A.    Dismissal Pursuant to Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader

is entitled to relief," Fed. R. Civ. P. (8)(a), which serves to "'give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Rule 12(b)(6) provides a vehicle

for parties to challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim

upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When presented with a motion to

dismiss for failure to state a claim, the district court must accept as true the well-pleaded factual

allegations in the complaint.  *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

Although "detailed factual allegations" are not necessary to withstand a motion to dismiss, a

plaintiff must provide the "grounds" of "entitle[ment] to relief," which requires "more than labels

and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550

U.S. at 555.

### B.    Reconsideration Pursuant to Rule 54(b)

"Rule 54(b) governs reconsideration of interlocutory or non-final orders[.]" *Murphy v.

Exec. Off. for U.S. Attorneys,* 11 F. Supp. 3d 7, 8 (D.D.C. 2014), *aff'd*, 789 F.3d 204 (D.C. Cir.

2015); *Cobell v. Norton,* 224 F.R.D. 266, 271 (D.D.C. 2004) ("Rule 54(b) governs reconsideration

of orders that do not constitute final judgments in a case.").

Rule 54(b) provides, in relevant part, "that any order or other decision, however designated,

that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties

does not end the action as to any of the claims or parties and may be revised at any time before the

entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Lucas v. District of Columbia*, 214 F. Supp. 3d 1, 5 (D.D.C. 2016) (citing Fed. R. Civ. P. 54(b)).  A motion for relief under Rule 54(b) is considered under the "as justice requires" standard.  *Murphy,* 11 F. Supp. 3d at 8.  Such relief may be warranted when "the movant demonstrates: . . . an intervening change in the law; . . . the discovery of new evidence not previously available; or . . . a clear error in the first order[,]" *id.* or when the Court has "patently misunderstood the parties, made a decision beyond the adversarial issues presented, [or] made an error in failing to consider controlling decisions or data," *Ali v. Carnegie Inst. of Wash.,* 309 F.R.D. 77, 80 (D.D.C. 2015).  "These considerations leave a great deal of room for the court's discretion and, accordingly, the 'as justice requires' standard amounts to determining 'whether [relief upon] reconsideration is necessary under the relevant circumstances.'"  *Lewis v. District of Columbia,* 736 F. Supp. 2d 98, 102 (D.D.C. 2010) (quoting *Cobell,* 224 F.R.D. at 272).

**C.      Summary Judgment Pursuant to Rule 56**

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material fact" is one whose existence affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" exists when the non-movant produces sufficient evidence of a material fact so that a fact finder is required to resolve the parties' differing versions at trial.  *Id.* at 249.

Summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material

fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must

point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*,

477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986)).  A

moving party may therefore succeed on summary judgment by showing that the non-moving party

"fail[ed] to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at

322.  A moving party may also succeed by pointing to the absence of evidence proffered by the

nonmoving party.  *Id.*

In considering a motion for summary judgment, a court must "eschew making credibility

determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir.

2007), and all underlying facts and inferences must be analyzed in the light most favorable to the

non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without

any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d

671, 675 (D.C. Cir. 1999).

## ARGUMENT

## I.   Plaintiff's APA Claim Should be Dismissed for Failure to State a Claim

### A.   Plaintiff's APA claim is barred because the INA provides an adequate alternate remedy.

Plaintiff cannot state a claim under the APA because Congress expressly provided an

alternative adequate remedy under the INA for any person denied a right or privilege as a national

of the United States.  *See* 8 U.S.C. § 1503.  Because Plaintiff seeks review of the Department of

State's denial of a right or privilege as a national of the United States—the denial of Baby M.'s

CRBA and passport applications—he must challenge the Department of State's decision under the

applicable INA review provisions in the appropriate judicial district, and may not proceed in this

Court under the APA.  Accordingly, Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted.

The APA provides a general cause of action to "person[s] suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, and provides that the reviewing court shall "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706.  Judicial review under the APA is only available, however, when "there is no other adequate remedy in a court[.]"  5 U.S.C. § 704.  Indeed, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

To be considered "adequate," the alternative relief available need not provide an identical review that the APA would provide, so long as the alternative remedy offers the "same genre" of relief.  *Citizens for Responsibility & Ethics in Wash. ("CREW") v. Dep't of Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017) (quoting *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)).  Alternative relief "will be deemed adequate 'where a statute affords an opportunity for *de novo* district-court review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz*, 396 F.3d at 1270).  This is because "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA."  *El Rio Santa Cruz*, 396 F.3d at 1270 (internal citation and quotation marks omitted).  Where an adequate remedy is available, a plaintiff lacks a cause of action under the APA to challenge an agency's alleged error.  *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (absence of an adequate alternative remedy is an element of the cause of action created by the

18

APA).

The processes set forth at Section 1503(b) to (c) provide Plaintiff and Baby M. an adequate remedy by which Baby M. can not only seek admission into the United States, but by which she can ultimately obtain judicial review.  Pursuant to those provisions, Baby M. may seek a certificate of identity and, if she obtains one and is admitted, then she may come to the United States and seek a judicial determination of her citizenship under Section 1503(a).  Courts in this district and elsewhere have recognized that Section 1503(a) provides plaintiffs an adequate avenue to assert citizenship claims in the context of challenging a revoked passport.  *Hassan v. Holder*, 793 F. Supp. 2d 440 (D.D.C. 2011); *see also Flores v. Pompeo*, 936 F.3d 273, 277 (5th Cir. 2019).

But even in the event that Baby M. is not admitted into the United States after obtaining a certificate of identity, she would still have an adequate remedy available to her because she could seek review of any "final determination by the Attorney General that [she] is not entitled to admission" in habeas proceedings.  8 U.S.C. § 1503(c).  And even if the Department denied her application for a certificate of identity, she could appeal that decision to the Secretary of State, 8 U.S.C. § 1503(b), and then, if the Secretary affirms the denial and no other remedy is available, seek review of the Secretary's determination in district court under the APA.  In other words, all roads lead to judicial review concerning Baby M.'s claim of citizenship.  Section 1503(b) to (c) therefore constitutes another adequate remedy and precludes APA review.

Considering a similar case, the Fifth Circuit held that the procedures in Section 1503(b) to (c) constitute an adequate remedy for persons outside the United States to challenge a passport revocation based on a finding that they are not citizens, which therefore precludes APA review. *See Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018) ("In sum, § 1503 expresses a clear congressional intent to provide a specific procedure to review the Plaintiffs' claims.  Permitting a

cause of action under the APA would provide a duplicative remedy, authorizing an end-run around that process."). Notably, in reaching this conclusion, the Fifth Circuit relied on case law from this Circuit to determine what constitutes an "other adequate remedy." *See id.* at 311 (citing *Garcia*, 563 F.3d at 523; *CREW*, 846 F.3d at 1245). The Fifth Circuit affirmed dismissal of the APA claims. *Id.* at 312. Defendant urges this Court to reach the same result.

Defendant is aware that two other courts in this district have held that Section 1503(b) to (c) does not constitute an adequate remedy to challenge the revocation of a document based on a finding of noncitizenship: *Chacoty v. Pompeo*, 392 F. Supp. 3d 1 (D.D.C. 2019), and *Gonzalez Boisson v. Pompeo*, Civ. A. No. 19-2105 (JDB), 2020 WL 20438889 (D.D.C. Apr. 28, 2020).[4] In reaching their decisions, the *Chacoty* and *Gonzalez Boisson* courts both relied heavily on *Rusk v. Cort*, 369 U.S. 367 (1962). But *Cort* does not control the result here for a number of reasons.

First, the circumstances that rendered the Section 1503(b) to (c) procedures inadequate for *Cort* are not present here. This is plainly evident in how the Supreme Court framed the question before it in *Cort*: whether "Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States." *Id.* This case presents very different circumstances: Baby

---

[4]     The D.C. Circuit's decision in *Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017), does not conflict with the proposition that APA review is unavailable when an individual seeks to challenge an agency's denial of a right or privilege of citizenship on the ground that the individual is not a U.S. citizen. Although the *Xia* court allowed the plaintiffs' APA claim to proceed alongside plaintiffs' § 1503 claim, it did so in the context of an APA claim asserting that plaintiffs' "passport revocation was allegedly arbitrary because putatively based on an event that had yet to occur, and allegedly contrary to law because accomplished without the requisite administrative hearing." 865 F.3d at 657. This claim did not substantively challenge the agency's determination that plaintiffs were not U.S. citizens but rather challenged the procedures under which the revocation took place. *See id.* Further, *Xia* did not specifically decide whether an adequate remedy existed so as to preclude plaintiffs' APA claims; it simply rejected the district court's conclusion that plaintiffs had failed to exhaust administrative remedies and remanded the claim for further consideration. *Id.*

M. has never set foot in this country, nor is she subject to arrest, nor would she face time in jail. In *Cort*, the State Department never doubted that the plaintiff, who was born in Massachusetts in 1927, was a U.S. citizen at birth.  *Cort*, 369 U.S. at 369.  Cort registered for the Selective Service in 1951 shortly before traveling to Europe, but, while in Europe, failed to report for the draft board's required physical examinations and for induction into the Armed Forces.  *Id.* Consequently, in 1954, while the plaintiff was still in Europe, he was charged in federal criminal court with draft evasion.  *Id.*  He later applied from Europe to renew his expired passport and was denied under then Section 349(a)(10) of the INA, which stated that U.S. citizens who stayed outside of the country for the purpose of avoiding the draft would lose their citizenship.  *Id.*

Cort sought review of his passport denial from abroad under the APA.  In particular, he sought to challenge the constitutionality of the statute that stripped native-born U.S. citizens of their citizenship for draft evasion.  *Id.* at 370.  The government moved to dismiss the action on the grounds that Section 1503(b) to(c) provided the exclusive procedure under which Cort could attack the administrative determination that he was not a citizen.  *Id.*  The district court denied the motion, finding that Section 1503(b) to (c) did not constitute the exclusive procedure under which Cort could attack his loss of citizenship.  *Id.*  The district court later found that the statute upon which the State Department stripped Cort of his citizenship was unconstitutional.  *Id.*

The Supreme Court upheld the district court's determination that Section 1503(b) to (c) did not provide Cort the exclusive means of remedy.  *Id.* at 375.  In doing so, the Supreme Court observed, that because Cort had been criminally charged with draft evasion, seeking admission into the United States under Section 1503(b) to (c) would subject him to criminal detention and prosecution, even if his challenge to the loss of his citizenship were successful.  *Id.*  Cort would

have faced criminal detention and prosecution had he sought admission at the border, even if he had prevailed in his separate citizenship claim. Baby M. has not alleged any similar concerns.

In addition, and most significantly, the crux of Cort's claim was a constitutional challenge to the statute under which the State Department revoked his citizenship for draft evasion. The heart of Plaintiff and Baby M.'s claim, by contrast, is that Baby M. acquired U.S. citizenship at birth via statute on account of her parents' U.S. citizenship and presence in the United States prior to her birth. This is precisely the type of factual dispute that the administrative procedures in § 1503(b)–(c) were designed to address. *See* 8 U.S.C. § 1503(b), (c); *Cort*, 369 U.S. at 391-96 (Harlan, J., dissenting) (explaining the legislative history of § 1503(b), (c)). Accordingly, the reasoning in *Cort* is inapt to the situation at hand, and the Court should conclude that Section 1503(b) to (c) provides Plaintiff and Baby M. an adequate remedy precluding review under the APA.

Second, *Cort* did not refer to the adequate-alternative-remedy exception in 5 U.S.C. § 704, but to the separate provision in Section 703 requiring not only that an alternative be "adequate," but that it also be the "exclusive" opportunity for review provided by law. *Id.* at 371-72 (quoting APA, § 10(b). It was this exclusivity requirement on which the Supreme Court targeted its analysis, concluding that the use of the term "may" in Section 1503(b) to (c) did not indicate an intention to establish an exclusive remedy. *Id.* at 375. The *Chacoty* and *Gonzalez Boisson* courts found it convincing that *Cort* applied a "clear and convincing evidence" standard to determine Congressional intent, which is the same standard used by this Circuit in evaluating whether there is another adequate remedy. *See, e.g.*, *Chacoty*, 392 F. Supp. 3d at 10. But *Cort* applied that standard to a different question—exclusivity—than is relevant in the Section 704 context— adequacy. The analysis in *Cort* is therefore not controlling.

Finally, litigants can no longer cite the APA as an independent source of subject matter jurisdiction, as *Cort* did.  *Califano v. Sanders*, 430 U.S. 99, 106-07 (1977).  Rather, the APA is now construed solely as a limited waiver of sovereign immunity applying only where there is a "final agency action for which there is no other adequate remedy in a court."  *Id.*; 5 U.S.C. § 704; *see also Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) ("The APA excludes from its waiver of sovereign immunity . . . claims for which an adequate remedy is available elsewhere.") (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992)) (alterations in original); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004) ("[T]he waiver of sovereign immunity under § 702 is limited by the 'adequate remedy' bar of § 704.").  As such, the Court must strictly construe the scope of Section 704 in favor of the sovereign.  *Id.; Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  With that understanding in mind, *Cort* does not control the outcome of this case.

In sum, Baby M.'s path to judicial review lies under Section 1503(b) to (c), not the APA, which requires as a first step that Baby M. apply to a diplomatic or consular officer of the United States for a certificate of identity.  Plaintiff and Baby M. have not taken this or any other step required under Section 1503(b) to (c).  Plaintiff's APA claim is therefore barred and should be dismissed.

## B. The Court's prior ruling is inconsistent with a finding that the Department of State acted arbitrarily and capriciously in denying Baby M.'s CRBA and passport applications.

Count 3 of Plaintiff's Amended Complaint alleges that "Defendant's Final Agency Decision [*i.e.*, the Embassy's denial of Baby M.'s CRBA and passport applications] is Arbitrary and Capricious in violation of the [APA]."  This Court however, has already determined that the record before the Embassy and the Court contained numerous "inconsistencies that support the Embassy's final decision that Mr. and Mrs. Sabra's submissions are insufficient proof of Baby M's

birth, identity, and citizenship," Mem. Op. at 68-71, and that "Mr. Sabra has failed to provide sufficient documentation as proof of Baby M.'s birth, identity and citizenship, as required by the applicable statutes and regulations." Mem. Op. at 70. This prior ruling would be wholly inconsistent with any finding that the Department acted arbitrarily or capriciously in denying Baby M.'s applications. While the Court's prior order is not a final order for purposes of claim or issue preclusion analysis, in the interest of judicial economy this Court should nevertheless adopt its own prior reasoning and dismiss Plaintiff's APA claim for failure to state a claim or, in the alternative grant summary judgment to Defendant on the basis of the record already before this Court.

The APA provides that Courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D). The Supreme Court has instructed that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983). An action is not arbitrary or capricious where the agency "articulate[s] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made" and the Court "consider[s] whether the decision was based on a consideration of the relevant factors" and determines that there has been no "clear error of judgment." *Id.* (internal quotations omitted).

Here, in connection with the first round of summary judgment briefing on Plaintiff's Count 1, Defendant already articulated a "rational connection between the facts found," during Baby M.'s application process and the ultimate "choice made" to deny Baby M.'s applications. Specifically, Defendant identified the Sabra's refusal to present Baby M. in satisfaction of the in-

person appearance requirement, the lack of evidence of Baby M.'s alleged emergency medical condition, and the multiple indicia of fraud in the documents the Sabras submitted in connection with the applications as the reasons supporting the agency's decision. *See* Def's Opp. to Pl's Mot. for Summary Judgment (Sealed), ECF No. 28 at 8-16; Def's Reply in support of his Mot. for Summary Judgment (Sealed), ECF No. 29 at 6-16.  This Court examined the record submitted by the Sabras and determined that there had been no "clear error of judgment" on the part of the Embassy.   On the contrary, the Court found that "Mr. Sabra has failed to provide critical information, specifically Baby M.'s written medical records to substantiate Baby M.'s birth and health condition," and that "[t]he current record contains the following inconsistencies that support the Embassy's final decision that Mr. and Mrs. Sabra's submissions are insufficient proof of Baby M.'s birth, identity, and citizenship" which the Court went on to list over several pages.  Mem. Op. at 68-70.  The Court concluded that "Mr. Sabra has failed to provide sufficient documentation as proof of Baby M.'s birth, identity and citizenship, as required by the applicable statutes and regulations," Mem. Op. at 70, a holding that forecloses the possibility that the agency's decision to deny the applications was arbitrary and capricious.

Plaintiff has not asked this Court to reconsider its prior ruling.  Instead, Plaintiff has sought to relitigate the same issue under the guise of an APA claim.  But a finding that the agency acted arbitrarily and capriciously in denying Baby M.'s applications would be inconsistent with the Court's prior ruling.  "Inconsistency is the antithesis of the rule of law.  For judges, the most basic principle of jurisprudence is that "'[courts] must act alike in all cases of like nature.'" *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (quoting *Ward v. James,* [1966] 1 Q.B. 273, 294 (C.A.) ((quoting Lord Mansfield in John Wilkes' case, *Rex v. Wilkes,* 98 Eng. Rep. 327, 335 (1770))).  To avoid inconsistency and the unnecessary expenditure of judicial resources relitigating

this issue, the Court should adopt its prior rationale and dismiss Plaintiff's APA claim for failure to state a claim.  Alternatively, the Court should grant summary judgment to Defendant on the record already before the Court.

## II.     The Court Should Reconsider its Determination that Plaintiff Met His Initial Burden on his RFRA Claim Because the Department's Conduct Did Not Impose a Substantial Burden on Plaintiff's Religious Exercise

With respect to Mr. Sabra's assertion that the Embassy violated his rights to freely exercise his religion under RFRA, this Court concluded that the Secretary imposed a substantial burden on his religious beliefs.  Mem. Op. at 79-87.  While the Court correctly found that Vice-Consul Woda suggested ways to establish Baby M.'s parentage that included a DNA test or photographs of Ms. Sabra's pregnancy, it incorrectly construed these two suggestions as requirements.  *Id.* at 86. Moreover, the Court did not take into account the government's continued willingness to receive any evidence of Baby M.'s birth or Ms. Sabra's pregnancy.  8/16/19 Hearing Tr. at 70; 9/4/19 Hearing Tr. at 25.  The government therefore asks the Court to reconsider its ruling pursuant to Rule 54(b), find that Vice-Consul Woda did not require a DNA test or photographic proof, and hold that the Secretary did not impose a substantial burden on Mr. Sabra's religious beliefs.

As the government stated in its brief in support of its first motion for summary judgment, the State Department "merely required Plaintiff to provide evidence of the parent-child relationship without any pressure on the Plaintiff to change their behavior in violation of their religion."  Def's Mem., ECF No. 18-1 at 23.  While the CRBA and passport applications were still pending, the government also proffered that it would be willing to accept *any* evidence that

Plaintiffs could offer in to establish the parental relationship.[5]   And while the Court correctly points out that the State Department *may* require DNA testing to establish a biological relationship between a parent and claimed child, Mem. Op. at 86 (emphasis added), the record does not support the conclusion that the State Department actually required DNA testing in this case or that this guidance extends to photographic evidence.  The State Department merely requested evidence.

Consequently, the Court should consider whether the *request* for any evidence imposes a substantial burden on Plaintiff's religious beliefs, and not whether Plaintiff would engage in conduct prohibited by the Sabras' religion if he provided DNA or photographic evidence.  The mere request for any evidence of parentage, including alternatives to DNA or photographic evidence, arises to no more than "[a]n inconsequential or *de minimis* burden on religious practice." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).  Plaintiff cannot be said to face "substantial pressure" to provide DNA or photographic evidence if the government was willing to receive alternative evidence.

---

[5]     The government stated its willingness to receive any other evidence of parentage on two separate occasions:

> [T]he other additional documents that were needed was proof of the relationship, and those could be anything that would show that Mrs. Sabra was recently pregnant and gave birth to Baby M. That could be the photos that we discussed, it could be DNA, *it could be anything else that they have that they can think of*. It could be declarations from other individuals. *Any evidence would be taken into consideration*.

8/16/19 Tr. at 72-73 (emphasis added).

> [I]f the plaintiff is willing, Mr. Sabra or Mrs. Sabra is willing to provide DNA, that that evidence would be considered. And also, *that is not the only evidence that the embassy is willing to receive*. Any evidence of pregnancy or birth is also still available.

9/4/19 Tr. at 25 (emphasis added).

The government is unaware of, and Plaintiff fails to cite, any authority supporting the proposition that a substantial burden under RFRA exists even when the government provides reasonable alternatives to actions that a religious adherent would find objectionable. To the contrary, in *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), the D.C. Circuit determined that a ban on selling t-shirts on the National Mall did not preclude alternative means for adherents to fulfill their religious obligations.  253 F.3d at 17 (noting that "mak[ing] religious motivation the critical focus [reads] out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement"); *see also Weir v. Nix*, 114 F.3d 817, 821-22 (8th Cir. 1997) (considering alternatives to determine whether burden was substantial); *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (no substantial burden where alternatives available), *superseded by statute*, RFRA, *as recognized in Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995); *cf. Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) (no substantial pressure to violate religious beliefs when prisoner had alternatives).  In this case, the government offered alternative means by which Plaintiff could have established parentage, including declarations from other individuals, without limiting the variety of evidence that would have been taken into consideration. 8/16/19 Tr. 72-73.

## III.   Defendant is Entitled to Summary Judgment on Plaintiff's RFRA Claim Because the Department's Request for Additional Evidence Furthered Compelling Government Interests and Did so Through the Least Restrictive Means

Even if Plaintiff had adequately pled a substantial burden, which he has not, the Department would nonetheless be entitled to summary judgment with respect to Plaintiff's RFRA claim.  Indeed, as established in the declaration of Paul Peek, a Consular Officer's ability to request additional evidence of identity or citizenship from CRBA and passport applicants is in furtherance of compelling governmental interests and is the least restrictive means of furthering those interests.

A.       **The Department's CRBA and passport application processes serve compelling governmental interests.**

The United States has a compelling interest in ensuring that U.S. citizenship documentation is obtained only by those entitled to it and in protecting the passport and CRBA application processes against fraud.  Peek Decl. ¶¶ 4, 20, 28.  The United States also has a compelling government interest in defending against international child abduction, illegal adoption, and child trafficking.  Peek Decl. ¶¶ 17-18, 21.  These interests go to the heart of the country's national security, Peek Decl. ¶ 28, and are thus "interests of the highest order."  *See Sample v. Lappin*, 424 F. Supp. 2d 187, 195 (D.D.C. 2006) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215, (1972)).  The Department of State's CRBA and passport application processes, including Consular Officer's ability to request additional evidence, serve these compelling government interests.

Passports are travel documents attesting to the bearer's identity and nationality.  Peek Decl. ¶ 4.  As such, in addition to applicable laws and regulations, the Department has policies and procedures for adjudicating each applicant's identity, identifying and preventing fraud, and ensuring the applicant is otherwise entitled to a U.S. passport.  Peek Decl. ¶ 4.  A CRBA is a formal document certifying the acquisition of U.S. nationality at birth by a person born abroad.  Peek Decl. ¶ 5.

Applicants for U.S. passports and CRBAs have the burden of proving by a preponderance of the evidence, also known as balance of probabilities, their identity and that they are citizens of the United States.  Peek Decl. ¶ 6.  An adjudicating officer may require additional evidence of identity or citizenship in accordance with Department guidelines, the U.S. Code, and the Code of Federal Regulations.  Peek Decl. ¶ 6.

Consular officers are empowered by the Secretary of State to adjudicate passport applications overseas and to determine whether an applicant has met the preponderance of the

evidence standard as to their U.S. citizenship, identity, and entitlement to a passport.  Peek Decl. ¶ 7.  Consular officers must follow established adjudication policies and procedures, use adjudicative logic and discretion, and research and use appropriate resources to ensure that the standard of evidence for citizenship and identity is met.  Peek Decl. ¶ 7.  In doing so, consular officers have authority to determine whether to seek additional information in support of a passport application. Peek Decl. ¶ 7.  Such additional information may be sought by, for example, by requesting secondary evidence such as pre- or post-natal medical records, photographs, credible affidavits, or suggesting that an applicant seek DNA testing to verify a parent-child relationship, when a child claims derivative U.S. citizenship through a U.S. citizen parent or the child's identity is otherwise in doubt.  Peek Decl. ¶ 7.

As with passports, adjudicating officers are authorized to adjudicate CRBA applications overseas and to determine whether an applicant has met the preponderance of the evidence standard as to their U.S. citizenship using all the adjudicative tools at their disposal.  Peek Decl. ¶ 8.

Assessing whether an applicant has provided sufficient evidence to establish a claim to U.S. citizenship can usually be accomplished through review of documentary evidence provided by the applicant.  Peek Decl. ¶ 9.  In reviewing documentation and evidence submitted in support of a passport or CRBA application, an adjudicating officer must examine the citizenship and identity evidence carefully to determine if the documents are valid.  Peek Decl. ¶ 9.  This requirement applies to foreign documents such as birth certificates and marriage certificates.  Peek Decl. ¶ 9.

An attributed identity is given at or near birth: the full name, date of birth, place of birth, and parents' names.  Peek Decl. ¶ 10.  Among other things, a birth certificate can be used to

establish an applicant's identity.  Peek Decl. ¶ 10.  Attributed identities, however, are vulnerable to fraud because an attributed identity can be forged, manipulated, or assumed by an impostor. Peek Decl. ¶ 10.

In adjudicating a claim to U.S. citizenship based on birth abroad to a U.S. citizen parent(s), the adjudicating officer must be satisfied that the evidence submitted is sufficient to establish the facts of birth, for example, the child's full name, date of birth, place of birth, and parents' names. Peek Decl. ¶ 11.  Adjudicating officers are trained to review and assess the validity of local documents including birth certificates and marriage certificates.  Peek Decl. ¶ 12.  In some foreign jurisdictions, including Gaza, the Department has limited resources to confirm the authenticity of documents issued by the local authorities.  Peek Decl. ¶ 12.  As a result, adjudicating officers must rely on their training and expertise to identity fraud indicators, which may cast doubt on the credibility or authenticity of a foreign document and request additional evidence, as appropriate. Peek Decl. ¶ 12.  If credible primary evidence of an applicant's birth, such as a timely filed certified copy of the applicant's foreign birth certificate, is unavailable, adjudicating officers are required to request secondary evidence of birth.  Peek Decl. ¶ 13.  If doubts arise as to a child's identity or parentage, adjudicating officers are instructed to make further inquiries and request additional documentation.  Peek Decl. ¶ 14.

When other forms of credible evidence are insufficient, DNA testing is commonly used to verify a parent/child relationship in conjunction with a citizenship case or an immigrant visa application.  Peek Decl. ¶ 15.  The Department does not *require* that an applicant or an applicant's parents submit a DNA test.  Peek Decl. ¶ 15.

If an applicant does not submit sufficient credible evidence, adjudicating officers are required to provide the applicant with written notification that her/his application will be denied if

additional evidence is not submitted within 90 days.  Peek Decl. ¶ 16.  If an applicant requests additional time to submit evidence within the 90-day period, adjudicating officers may grant an additional 90 days or other reasonable period of time based upon the circumstances.  Peek Decl. ¶ 16.  If additional evidence is not submitted within that time period, the incomplete application must be denied.  Peek Decl. ¶ 16.  The applicant should be notified in writing of the reason for the denial.  The final result of all passport and CRBA applications must be issuance, denial, or withdrawal requested in writing by the applicant.  Peek Decl. ¶ 16.  An applicant may always re-apply for a U.S. passport.  Peek Decl. ¶ 16.

The question of a relationship between applying parents and their alleged biological child born abroad is critical in adjudicating applications for U.S. passports and CRBAs.  Among other reasons, an adjudicating officer must be satisfied that a legal and biological relationship exists between the applying parents and their alleged child born abroad to defend against attempts to circumvent the foreign adoption procedures.  Peek Decl. ¶ 17.  To satisfy the biological relationship prong, an adjudicating officer may request documentary evidence to establish such relationships, including pre- and post-natal medical records, pregnancy photos, or other evidence to substantiate a biological relationship between one or both parents.  Peek Decl. ¶ 17.  To satisfy the legal relationship prong, an adjudicating officer will ask for evidence of such relationship under the local law where the child was born, most commonly a valid birth certificate listing the child's parents.  Peek Decl. ¶ 17.

It is the Department's duty to document children as U.S. citizens only after they are fully satisfied, under the totality of the circumstances, that the applicant has met their burden of proof as to their identity, U.S. citizenship, and entitlement to such document.  Peek Decl. ¶ 18.  In some instances, a U.S. citizen may falsely claim that a foreign-born child is his or her biological child,

when instead such person(s) has adopted the child or otherwise obtained physical custody of the child. Peek Decl. ¶ 18.  The State Department has encountered cases where false parentage claims were made to avoid full legal adoption and/or visa procedures and to instead fraudulently document the child as a U.S. citizen.  Peek Decl. ¶ 18.  In one example, U.S. citizens residing in Mexico appeared at the U.S. Embassy in Mexico City and attempted to document two grandchildren as U.S. citizens by means of a fraudulent Mexican birth record identifying the U.S. citizen grandparents as the children's parents.  Upon scrutiny of their application and citizenship claims, the grandparents admitted they were not the children's true parents.  Peek Decl. ¶ 18. Children born abroad to alien parents, who are later adopted by U.S. citizen parents, do *not* acquire U.S. citizenship at birth through their U.S. citizen parents.  Peek Decl. ¶ 19.

Because foreign birth records are subject to fraud, adjudicating officers are authorized to request additional supporting evidence to establish a child born abroad has not been unlawfully adopted.  Peek Decl. ¶ 20.  This is particularly important in cases where other fraud indicators exist which call into question the applying parent's relationship with their alleged child and therefore the child's identity.  Peek Decl. ¶ 20.  The United States has a compelling interest in ensuring that U.S. citizenship documentation is obtained only by those entitled to it.  Peek Decl. ¶ 20.

Adjudicating officers are required to properly identify the legal and biological parents of a child born abroad in part to defend against child trafficking efforts.  Peek Decl. ¶ 21.  The Office of Adjudication within the Passport Services Directorate of the U.S. Department of State's Bureau of Consular Affairs provides guidance in situations where a non-legal parent attempts to claim they are a child's legal parent or guardian.  Peek Decl. ¶ 21.  By law, passports may not be issued without the consent of all legal parents or guardians.  Peek Decl. ¶ 21.  The State Department's efforts to identify a child's true legal parents help address child abduction and child trafficking

33

concerns and ensure that absent third-party parental rights are not unlawfully extinguished.  Peek Decl. ¶ 21.  Ascertaining the biological and legal relationship between the applying parents and their alleged child born abroad, a burden which the applying parents bear, is therefore required to ensure U.S. citizenship documentation is obtained only by eligible applicants.  Peek Decl. ¶ 21.

> **B.**     **The Department's request for additional evidence was the least restrictive means of accomplishing its compelling interests in this case.**

Vice Consul Woda's request that the Sabras submit additional evidence in support of Baby M.'s CRBA and passport applications—which could, but must not necessarily, include DNA or pregnancy photos—was the least restrictive means of accomplishing the government's compelling interests in protecting against fraud and possible international child abduction, illegal adoption, and human trafficking.

In this case, the Sabras claim that Baby M. is their biological child, and that Ms. Ponn Sabra gave birth to Baby M. in Gaza.  *See generally* Am. Compl; Peek Decl. ¶ 23.  The adjudicating officer requested a number of pieces of primary evidence to verify this claim, including an authentic copy of the record of birth filed with local authorities.  Peek Decl. ¶ 23.  The adjudicating officer noted his concerns about the discrepancies in the birth records submitted to him, the fact that the alleged mother was beyond normal child-bearing years, and the absence of credible medical documentation to substantiate the Sabras' claim of emergency circumstances or to waive the personal appearance of the child.  Peek Decl. ¶ 23.

The adjudicating officer made further inquiries to try and establish the claimed biological and birth relationship of Ponn Sabra to Baby M.  Peek Decl. ¶ 24.  The officer requested copies of prenatal and post-natal records and medical documentation from the clinic where the birth allegedly occurred to determine whether Ms. Sabra was a patient and was the biological and birth mother of the child.  Peek Decl. ¶ 24.  The adjudicating officer explained to Ms. Sabra that

additional evidence of a biological relationship to Baby M. was required before she could obtain a CRBA and passport. Peek Decl. ¶ 24. The officer noted such evidence could include submission of pre and post-natal medical records, ultrasounds, and/or photos of Ms. Sabra during her pregnancy. Peek Decl. ¶ 24. It was only after Ms. Sabra stated that she did not have or would not produce those additional documents, that the adjudicating officer suggested that DNA evidence could be considered to establish a parent-child relationship. Peek Decl. ¶ 24.

Among other things, the Sabras subsequently submitted a declaration from a local doctor, Dr. ████, dated June 25, 2019. Peek Decl. ¶ 25. The adjudicating officer contacted Dr. ████ with the assistance of a translator to verify the information in his declaration. Peek Decl. ¶ 25.

The adjudicating consular officer contemporaneously identified a number of potential fraud indicators in the Sabras' application, including an alteration of Baby M.'s birth certificate, that prompted the officer's requests for additional evidence to support the child's identity and claim to U.S. citizenship. Peek Decl. ¶ 26. The list of potential fraud indicators used by Consular Officers is deemed sensitive but unclassified, and therefore cannot be shared publicly. Peek Decl. ¶ 26. Due his identification of these potential fraud indicators, the adjudicating consular officer determined that submission of pre- and post-natal medical records or photos of Ponn Sabra during the pregnancy, or any other evidence that could substantiate the claimed biological and birth relationship, was necessary because the Sabras had not met their burden of proving a biological relationship between Ponn Sabra and Baby M., which called into question Baby M.'s identity. Peek Decl. ¶ 26. Only after Ponn Sabra stated that she did not have, or would not produce, these additional documents did the adjudicating consular officer suggest that she could *also* provide a DNA analysis establishing a parent-child relationship between either or both Mohammed and Ponn

Sabra and Baby M.  Peek Decl. ¶ 26.  But throughout the process, the officer emphasized that multiple types of documentary evidence could help establish the necessary relationship for Baby M., including, for example, hospital medical records, credible affidavits, and pregnancy photos. The adjudicating officer reviewed and considered each document submitted in support of Baby M.'s application.  Peek Decl. ¶ 26.

Ultimately, the adjudicating officer determined that the Sabras had not met their burden of proof due to the numerous inconsistencies and fraud indicators contained within the submitted documents and a lack of credible evidence establishing a relationship between Mohammed or Ponn Sabra and Baby M.  Peek Decl. ¶ 27.  At no point did the Department require the Sabras to submit to DNA testing or to provide photos of Ms. Sabra pregnant, nor did it condition receipt of a government benefit on such submission.  *See infra* at 26-27.  As such, the Department's request for additional evidence, which could include medical records, declarations, photos, DNA, or any other evidence, was the least restrictive means of accomplishing its compelling interests.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the APA claim in Defendant's Amended Complaint and should grant summary judgment in Defendant's favor on the sole remaining claim, Plaintiff's RFRA claim.

Dated:  August 18, 2020

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
D.C. Bar #924092
Chief, Civil Division

By: *Diana V. Valdivia*
DIANA V. VALDIVIA
D.C. Bar # 1006628
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
T: (202) 252-2545
diana.valdivia@usdoj.gov

*Counsel for Defendant*